[Crim. No. 3221. Second Appellate District, Division One.—May 24, 1940.]

THE PEOPLE, Respondent, v. C. RAY GILLILAND et al., Appellants.

Jerry Giesler and Henry G. Bodkin for Appellants.

Earl Warren, Attorney-General, and Alberta Belford, Deputy Attorney-General, for Respondent.

WHITE, J.—In an indictment returned by the grand jury of Los Angeles County defendants were jointly accused in count I of the crime of conspiracy to violate the Corporate Securities Act and grand theft; count II charged a violation of the Corporate Securities Act; while in counts III and IV defendants were charged with the substantive offense of grand theft. Each defendant interposed a demurrer to the indictment, both general and special, which was overruled. Following the entry of not guilty pleas, the cause proceeded to trial before a jury, resulting in conviction of both defendants of the crimes charged in counts I, II and III and their acquittal of the offense alleged in count IV. Following the denial of their motions for new trial, motions in arrest of judgment, and the pronouncement of judgment against them, defendants prosecute this appeal from the judgment of conviction and the orders denying their respective motions for

new trial. The attempted appeals from the verdicts and sentences and from the orders denying motions in arrest of judgment are dismissed, for the reason that the same are not authorized by law. (Pen. Code, sec. 1237.) The cause is here presented by the appellants jointly upon one set of briefs, but in some instances their positions and contentions are several.

While not conceding that but one reasonable and logical inference can be deduced from the evidence, appellants nevertheless concede the existence of a conflict therein and recognize the limitations upon the power of an appellate tribunal to reverse a judgment upon the ground of insufficiency of the evidence when the triers of fact have resolved such evidentiary conflict against the accused. It therefore becomes unnecessary, for the present, to do other than epitomize the factual situation forming the background of this prosecution, in which, as disclosed by the evidence offered on behalf of the People, it appears that the complainant, Mrs. Jeanne Haskell, was introduced to defendant Goetz about November 21, 1935, and a few weeks later the latter introduced her to defendant Gilliland. In connection with this introduction it was testified that defendant Goetz said he wanted complainant to meet a very good friend of his, who had just come down from his ranch in Oregon; and for the purpose of such meeting defendant Goetz and complainant went to a cafe, where they partook of refreshments. At that time defendant Goetz represented to complainant that he and Gilliland had been partners in two business ventures; that Gilliland was very wealthy and was president of the W. B. Mayo Pill Company; that defendant Goetz further represented that he himself was a stockholder to the extent of approximately $6,000 in the said company (which was false) and that the company was making large profits and any investment made therein by the complainant would be very wise and profitable. That on or about January 2, 1936, the defendant sold to complainant a certificate evidencing 294 shares of the capital stock of said Mayo Company without obtaining from the commissioner of corporations of the State of California a permit so to do, and took in consideration therefor the sum of $10,000 from the complainant. In connection with this transaction it appears that on November 21, 1935, defendant Gilliland in the State of Oregon received a certificate of stock issued in his

name and which was given to him under the terms of an agreement he had with the corporation. That about April, 1936, the defendants obtained the further sum of $10,000 from complainant upon representations made by defendant Gilliland that said $10,000 would be used for advertising purposes in connection with the Mayo Corporation. During all of the alleged negotiations and during the time when the sale of stock was consummated and the second $10,000 was paid, there were frequent social contacts between complainant and defendants, particularly defendant Gilliland. The complainant and defendant Gilliland disagreed as to whether there was a promise of marriage between them, he insisting there was and she denying it, although admitting she had written letters to him in which she addressed him as ''sweet'', ''precious'' and the like. On January 4, 1936, the complainant, Mrs. Haskell, handed Gilliland a check for $9,936.10, which she had secured through a loan made on her home, and which check was payable to defendant Gilliland and also bore the indorsement ''O. K., R. L. Goetz''. In return for this money defendant Gilliland handed the complainant the stock certificate above referred to indorsed by him, but the same was never transferred out of his name on the books of the corporation. It might here be noted that a decided conflict in the evidence appears as to whether complainant actually purchased the stock from defendant Gilliland or whether she simply loaned him the money and received the certificate as security.

It appears that the second transaction was consummated about April 30, 1936, whereby a Beverly Hills bank paid defendant Gilliland approximately $10,000, the proceeds of a loan in that amount negotiated by Mrs. Haskell on certain property owned by her in the city of Los Angeles. The name of defendant Goetz does not appear on the canceled check in this transaction. Following this latter transaction Gilliland paid the complainant, Mrs. Haskell, $500, which he asserts was in payment of interest on the money she had loaned him, while she contends that it was in repayment of various smaller amounts advanced to defendant Gilliland for gambling and kindred purposes while the two were together socially. The complainant visited Gilliland at his Oregon ranch in June, 1936, and in September of the same year, but upon returning to Los Angeles was married to her present

husband.  Defendant Goetz was an invited guest at the announcement party and also at the wedding.

As early as September, 1936, complainant visited the office of the district attorney of Los Angeles County in connection with the moneys obtained from her by the defendants.  Apparently no action was taken following the investigation instituted on that occasion.  However, in June, 1938, complainant again went to the district attorney; the investigation was renewed, and the matter submitted to the grand jury, resulting in the indictment now before us.

In the main, appellants base their claims for reversal upon the alleged errors of the trial court in admitting certain evidence which it is asserted was prejudicial to their substantial rights.  In this regard it is first contended that such rights of defendant Goetz were prejudiced by the rulings of the court admitting in evidence as against him testimony relating to the alleged attempt of his codefendant, Gilliland, to corruptly induce a witness to give false testimony, which said attempt was made during the course of the trial and outside the presence of appellant Goetz, but which evidence the jury was authorized by the court to consider as against both defendants.  After the defendant Gilliland had concluded his testimony on direct examination and cross-examination he was recalled by the district attorney, who inquired of him as to whether, after the commencement of the trial, he did not visit the complainant's maid at the latter's home and state to her that he and his codefendant "see nothing ahead of us but the penitentiary unless we can get you or somebody else to come down and testify in our behalf"; whether the maid would testify that she knew that defendant Gilliland had spent nights at the home of the complaining witness in September, 1935; also, that the maid knew that he was engaged to complainant; that he borrowed the money mentioned in the indictment from the alleged victim; and finally, if he did not tell the maid that his codefendant Goetz "is spending a lot of money in this case, and if you will come down and testify to anything in our behalf Mr. Goetz will pay you well".  Following categorical denials by defendant Gilliland that he made any of the statements attributed to him, the complainant's maid was called to the witness-stand, and after stating that defendant Goetz was not present was permitted to testify that defendant Gilliland

did make such statements upon the occasion of his visit to her. Such examination of the maid was concluded by the district attorney's propounding this question: ''Well, what was the condition of his eyes? Don't tell us anything else now, just the condition of his eyes at the time you looked, at the time he made the statement I have just outlined to you a moment ago.'' (Referring to the statement, ''Mr. Goetz and I see nothing ahead of us but the penitentiary unless we can get you or somebody else to come down and testify in our behalf.'') To which question the maid answered, ''He just looked worried as to his eyes.''

Timely, appropriate and vigorous objections were interposed to this line of testimony on behalf of appellant Goetz, who was not present at the conversation and whose authorization of or even knowledge of the visit of his codefendant was never established. But such objections were promptly overruled, motions to strike denied, and the jury advised that such evidence was to be considered by them as against both defendants. That this testimony when considered against him was highly prejudicial to appellant Goetz cannot be denied, for it involved him in an attempt to suborn perjury through the medium of bribing a witness at his trial to give false testimony. The damaging effect of this testimony to appellant Goetz was sensed by the district attorney who read it to the jurors and laid great stress upon it in both his opening and closing arguments.

We have no hesitancy in saying that this testimony should not have been admitted as against appellant Goetz. While it is true, as stated in 16 C. J., 661, section 1318, that a conspiracy may continue beyond the commission of the crime to which the conspiracy relates, such as for the purpose of concealing the crime, securing the proceeds thereof, or bribing or influencing witnesses, nevertheless, there must be some evidence showing that such activities were a part of the scheme or plan of the conspirators. The record before us is bereft of any such evidence, and is equally barren of any evidence showing that appellant Goetz was connected with or authorized the efforts to tamper with the witness. Hence it was palpable error to receive in evidence as against appellant Goetz the acts and declarations of his former alleged coconspirator made without his proven knowledge, consent or presence, and after the conspiracy charged had terminated

—in fact while the case was actually on trial. As to appellant Goetz this testimony was hearsay, and its inadmissibility is so elemental in the law of conspiracy that citation of authority is unnecessary. The case of *People* v. *Burke,* 18 Cal. App. 72 [122 Pac. 435], cited by respondent, is not here applicable nor persuasive, because in that case there was present strong circumstantial evidence tending to connect defendant with the transaction, and further, the court in permitting the jury to consider such evidence as to the defendant admonished them that "unless you are satisfied from all the evidence that the defendant did cause or authorize the persuasion or disappearance of such witness, you cannot consider it as a circumstance against the defendant". The dissimilarity to the case at bar is evident.

It is next asserted that the court committed prejudicial error as to both defendants in admitting as against them evidence relating to a statement made by the defendant Goetz in the office of the district attorney shortly prior to the return of the indictment and in the absence of the defendant Gilliland. Particular objection is made to the evidence relating to that portion of the statement having to do with other alleged prior independent criminal and fraudulent acts on the part of defendant Goetz, the narrator of the statement, and all of which evidence the court permitted the jury to consider as against both defendants. In this regard it appears that on June 20, 1938, nine days before the indictment was returned by the grand jury, defendant Goetz, accompanied by his attorney, called upon the deputy district attorney who tried this case. At that time defendant Goetz made a statement consisting of interrogatories propounded by the deputy district attorney and answers given thereto by defendant Goetz, all of which was taken down by a shorthand reporter. By stipulation of counsel for defendant Goetz and the district attorney, but over objection of counsel for defendant Gilliland, who was not present when the statement was made, certain portions thereof relating to the indorsement by Goetz of a check for $9,936.10, and the receipt by Goetz of $169 from his codefendant Gilliland, together with the reason for the payment of such last-named sum, was read to the jury. When subsequently defendant Goetz took the witness stand he was interrogated concerning that portion of

his statement theretofore read into the record, viz., concerning the item of $169 and the reason for its payment to him by his codefendant. The only other reference to the statement appears to be when his counsel on direct examination of Goetz asked the latter concerning certain testimony given by the witness Haskell and inquired of defendant Goetz if he had made the statements attributed to him by Haskell. With the record in this state, the district attorney on cross-examination of defendant Goetz very properly interrogated him concerning the $169 transaction about which he had been examined by his counsel on direct examination. In the apparent belief that the heretofore indicated references to the statement opened the door for cross-examination concerning the entire statement, the district attorney was permitted, over repeated objections, to cross-examine defendant Goetz as to other matters contained in the statement, of which the following is typical:

"Q. (By Deputy District Attorney Burgess): Now, you have made several references here to the statements that you made there in the district attorney's office, statements that you made there to the deputy in charge, Mr. Burgess, being myself. I will ask you if you did not at the same time and place tell me of some five or six other cases then pending or which had been pending in the courts against you for money that you had taken from women?

" . . .

"A. I did not tell you that I had taken any money from any women."

Then followed an interrogation of defendant Goetz by the district attorney as to whether a lawsuit had not been brought against him by the guardian of an incompetent woman to recover $300,000 illegally taken from her; whether he had not taken $38,000 away from another woman; whether he was not involved in an embezzlement charge at Santa Barbara and arrested in Florida at the instance of the district attorney of Santa Barbara County; if he was not the same Goetz charged with rape in the Los Angeles superior court, and also in the same court accused of forgery; and finally, if it was not a fact that he came to the district attorney's office after regular hours to make the statement in question in order to avoid being served with process in the lawsuit filed against him by the guardian of the incompetent woman.

All of the foregoing was received in evidence against both defendants. A mere reading of the same at once suggests its damaging effect upon both defendants. The prejudicial effect of the testimony cannot be exaggerated when we consider that the defendants were charged jointly with the theft of $20,000 from a woman who they claimed loaned the money to one of them because of her affection for him. This testimony could not but impress the jury that defendant Goetz had been accused of taking money from five or six other women; that an action had been brought against him by the guardian of an incompetent woman to recover $300,000 allegedly taken from her illegally; that he had mulcted another woman of $38,000; that he had been sued by still another woman for fraud in obtaining money from her; that he had been involved in an alleged embezzlement; was arrested in Tampa, Florida, at the request of a district attorney in California for illegally and fraudulently selling stock, in connection with which transaction his family made restitution in the sum of $2,200; that at one time during his minority he was charged with statutory rape for which he was committed to the Preston School of Industry at Ione; that he had been charged with the crime of forgery. In connection with the implications of criminal prosecutions, the law provides an orderly method for the introduction of such evidence when the same is properly admissible. Nor does the fact that during the *voir dire* examination of jurors counsel for defendant Goetz referred to his involvement in a rape charge cure the error, because this incident furnished but a small part of the damage done the substantial rights of defendants to a fair trial conducted in proper procedural form and in accord with due process of law. Moreover, how any of the evidence was receivable as against the codefendant, Gilliland, is beyond our comprehension. As to him it was plain hearsay; yet in his argument to the jury the district attorney read the questioned testimony and vehemently predicated thereon his plea to the jury that it established both defendants as "confidence men". Not only did defendants' counsel persistently object to the introduction of this evidence and assign the asking of the questions as misconduct, but at the conclusion of the trial they made a motion to strike such cross-examination from the record, which motion was denied as to both defendants.

■ Admission of the testimony here under inquiry was not authorized by section 1854 of the Code of Civil Procedure, which in general provides that when part of a transaction is proved the whole is admissible, because, as in the instant case, when only a part of a writing was given in evidence by one party, the other party was privileged only to inquire into "the whole on the same subject". Manifestly, the district attorney was limited in his cross-examination to the same subject of the statement that was inquired into by the direct examiner. The evidence was therefore incompetent, because it did not relate to the "same subject" inquired into on direct examination and was not "necessary to make it understood." (*Zibbell* v. *Southern Pac. Co.,* 160 Cal. 237, 250 [116 Pac. 513]; *Moore* v. *Re,* 131 Cal. App. 557 [22 Pac. (2d) 45]; *John Breuner Co.* v. *King,* 9 Cal. App. 271 [98 Pac. 1077].) ■ The cross-examination of defendant Goetz in the case at bar also exceeded the limits allowed by section 1323 of the Penal Code, which restricts cross-examination of the defendant to "all matters about which he was examined in chief". (*People* v. *Arrighini,* 122 Cal. 121, 125 [54 Pac. 591].) As was said in *People* v. *Frank,* 75 Cal. App. 74, 76 [241 Pac. 924]:

"There is no rule better understood in our criminal procedure than that a person accused of crime cannot be compelled to testify against himself. After taking the witness stand and testifying in his own behalf, he can be cross-examined as to such matters to which he testified upon direct examination, but upon no other matter. This rule limiting the cross-examination of a defendant while a witness, to such matters testified to upon his direct examination, is a general rule applicable to all witnesses. But it has been held in some cases that the rule thus limiting cross-examination is much narrower when applied to the defendant as a witness than when applied to ordinary witnesses. (*People* v. *O'Brien,* 96 Cal. 171 [31 Pac. 45]; *People* v. *Crowley,* 100 Cal. 478 [35 Pac. 84].) The latter of these two cases quotes with approval the following language found in the former case: 'And in *People* v. *O'Brien,* 96 Cal. 171 [31 Pac. 45], the court says that "so far as the defendant is concerned, the court is not allowed that discretion as to the extent of the scope of the cross-examination which it is permitted to exercise in the examination of the other witnesses." ' The court also in the same case says: 'We have been referred to no case decided

since the present condition of the statutory law (sec. 1323, Penal Code) on the subject, which holds that the cross-examination of a defendant may be as wide as that of any other witness.' ''

The cross-examination certainly did not constitute impeachment of defendant Goetz, because there was nothing in his direct examination which the answers to the questions objected to on cross-examination explained, qualified or destroyed the force of in any way. The rules of evidence which permit testimony in proof of other crimes in order to show system or intent do not warrant introduction of evidence having no bearing on any issue involved in the charges upon which appellants were on trial. What bearing upon the issues of the trial was contained in the question as to whether defendant Goetz had been arrested in Florida for an alleged embezzlement, or whether in 1915 he had been charged with rape or forgery; or whether he had been sued by the guardian of an incompetent woman to recover certain moneys? Regardless of what other acts of misconduct defendant Goetz may have committed, he and his codefendant were entitled to a fair and impartial trial upon the issues raised by the indictment, and that in accord with the established rules of evidence. (*People* v. *Brown,* 25 Cal. App. (2d) 513 [77 Pac. (2d) 880] ; *People* v. *Berg,* 96 Cal. App. 430 [274 Pac. 433] ; *People* v. *Anthony,* 185 Cal. 152, 157 [196 Pac. 47].) The evidence in question did not tend to establish the guilt of the defendants of the crimes for which they were on trial, but tended only to degrade defendant Goetz and to prejudice both defendants before the jury, because under the rulings of the trial judge the jury was authorized and instructed to consider all this prejudicial evidence as against both defendants. When irrelevant testimony is admitted and where, as here, it is of such a character as necessarily to be prejudicial to the defendants, a new trial must be granted. (*People* v. *Martin,* 13 Cal. App. 96 [108 Pac. 1034] ; *People* v. *Asavis,* 22 Cal. App. (2d) 492 [71 Pac. (2d) 307] ; *People* v. *Ranney,* 213 Cal. 70 [1 Pac. (2d) 423] ; *People* v. *Angelopoulos,* 30 Cal. App. (2d) 538 [86 Pac. (2d) 873] ; *People* v. *Smith,* 151 Cal. 619, 624 [91 Pac. 511].) As was said in *People* v. *Anthony, supra*: '' . . . It is a psychological impossibility for the jury to wholly eradicate the impression made by such questions from their minds in weighing the evidence as to the guilt or innocence of the defendant on the particular

item charged. . . . A district attorney is charged with the public duty of seeing that the defendant has a fair trial. The jury is aware of this fact and must have assumed that he had information which justified the question. The question the district attorney asked of the defendant amounted to a charge against the defendant that he had been guilty of the offense of rape committed upon two small girls in his custody. The human mind is not so constructed that a thing of that kind can be either forgotten or overlooked by a jury.''

It requires no citation of authority for the assertion that statements made by one defendant outside the presence of his codefendant, not in furtherance of the alleged conspiracy and after consummation or frustration of the conspiracy, are hearsay as to the latter and never admissible. In the case now before us the statement given by defendant Goetz and reduced to writing by the district attorney, as well as the interview between defendant Goetz and the maid of the complaining witness, all transpired after the alleged conspiracy was accomplished and ended. As to defendant Gilliland there was not even the excuse for the admission of testimony based thereon that he was present upon either occasion.

It would unduly prolong this already lengthy opinion to quote further and numerous other and similar occurrences in a trial, the record of which is replete with errors of law in rulings made upon the introduction of what was manifestly incompetent, irrelevant and immaterial and pure hearsay evidence. Suffice it to say, for the guidance of the court upon a retrial, that it was also error to receive in evidence over objection as against defendant Goetz testimony relating to a conversation between defendant Gilliland and the witness John E. Haskell, husband of the complaining witness, alleged to have taken place at Reno, Nevada, outside the presence of defendant Goetz and at a time long subsequent to the consummation or frustration of the alleged conspiracy, and which conversation could not have been in furtherance of any alleged conspiracy, and in which conversation Haskell accused the defendant Goetz of stealing the money from his wife and wherein, according to the witness, defendant Goetz said, ''Yes, we took $20,000 from Jeanne, but we are going to give every bit back to her.'' Equally inadmissible was the testimony of the witness R. P. Johnson, called to corroborate the testimony given by the aforesaid witness Haskell. Just as erroneous was the ruling by which there was received in

evidence as against defendant Gilliland two conversations between defendant Goetz and the witness Haskell, one at Reno, Nevada, and the other at Los Angeles, both outside the presence of the defendant Gilliland and each occurring subsequent to the termination of the alleged conspiracy, and the subject-matter of which could not have been in aid or furtherance of the object of any alleged conspiracy. These are the conversations wherein the witness Haskell testified that defendant Goetz threatened him if he asked the district attorney's intercession in connection with the money charged in the indictment to have been taken from the witness' wife.

The action of the trial court in admitting all the evidence received at the trial as against both defendants was emphasized by the district attorney in his argument to the jury, wherein he said:

''You will recall that you went out shortly afterwards, and that upon your return to the courtroom some time later the court granted that motion, so that in so far as the evidence in chief of the prosecution was concerned, those of you who have made notes in attempting to distinguish between the evidence admissible against the defendant Goetz, or against the defendant Gilliland alone, may now forget that feature of it because of the fact that all the evidence that you have on the case of the People in chief was received as against both defendants, so that now, regardless of where the defendant Goetz was when Gilliland was doing something or where Gilliland was at the time Goetz was doing something, the evidence as to both defendants or as to either defendant or as to each defendant is admissible as against both defendants in the proof of the People's case.''

Although from the nature of the errors reviewed herein, a painstaking reading of the 1400 pages of testimony would seem unnecessary, in view of the provisions of section $4\frac{1}{2}$ of article VI of the Constitution, nevertheless such a review of the record shows that the evidence adduced upon the whole case was in sharp conflict and closely balanced in weight and in quality for and against the guilt of the defendants. Such conflicts are apparent on the question of whether the complainant actually purchased the stock from defendant Gilliland or whether she simply lent him money and received from him the certificate of stock as security. The evidence does show without contradiction that defendant Gilliland did procure and deliver to the complainant a policy of insurance

upon his life in which the complainant was named beneficiary as his "fiancee". She accepted this policy and retained it until the time of trial, when it was produced by her and admitted in evidence as defendants' exhibit. It is also in evidence that following the second $10,000 transaction defendant Gilliland paid Mrs. Haskell $500, which he claims was for interest, but which she says constituted reimbursement for small sums advanced to him from time to time on their social outings to night clubs and other places of amusement. In June, 1936, and as late as September of the same year, the complainant visited Gilliland at his ranch in the State of Oregon.

We do not understand section 4½ of article VI of the Constitution as intended to mean that merely because the evidence may legally be able to stand up under the weight of the judgment, that is sufficient reason in all cases for refusing to set aside the judgment. (*People* v. *Davis*, 210 Cal. 540, 556 [293 Pac. 32].) The phrase "miscarriage of justice" as used in the constitutional provision has no hard or fast definition, and as was said in *People* v. *Wilson*, 23 Cal. App. 513 [138 Pac. 971], "does not merely mean that a guilty man has escaped or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused, in a given case, to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time deprive them of life or liberty. 'It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure in which the substantial rights belonging to the defendant shall be respected.' "

If a defendant cannot be fairly convicted, he should not be convicted at all; to hold otherwise would be to provide ways and means for the conviction of the innocent. It cannot be gainsaid that you cannot inspire or preserve respect for the law by withholding its protection from those accused of crime. While deviation from the prescribed rules of law governing trial may result in justice for the particular defendant who is before the bar, it is dangerous to the community and its citizens. As was said by Chief Justice Hughes

of the United States Supreme Court not so long ago, "In our system, the individual finds security in his rights because he is entitled to the protection of tribunals that represent the capacity of the community for impartial judgment as free as possible from the passion of the moment and the demands of interest or privilege." When, as here, we are unable to say "whether appellants would or would not have been convicted, but for the errors of the court, we must direct a reversal". (*People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129].) We do not regard the evidence in this case as sufficient to put into operation the saving grace of section 4½ of article VI of the Constitution. Even convincing proof of a defendant's guilt does not necessarily mean, under all circumstances, that there has been no miscarriage of justice. (*People* v. *Mahoney,* 201 Cal. 618 [258 Pac. 607] ; *People* v. *Patubo,* 9 Cal. (2d) 537 [71 Pac. (2d) 270, 113 A. L. R. 1303].) From our examination of the record in this case we are of the opinion that the errors complained of have resulted in a miscarriage of justice. It is quite likely that the conviction of appellants was caused by the errors that are shown by the record. From the standpoint of the prosecution, the most that can be said is that the evidence as a whole which was legally admissible was quite evenly balanced. In venturing these observations, we speak only from the showing made by the record. It is true the jury had an opportunity to observe the demeanor of the witnesses and may have had reason to return the verdicts which were found irrespective of the errors which were committed during the trial. As to this, of course, we can say nothing. From the mere record, as we read it, the errors may very easily have turned the scale in favor of the prosecution. Appellants were denied that fair and impartial trial guaranteed by law, which amounts to a denial of due process of law. ·(*Powell* v. *Alabama,* 287 U. S. 45, 52 [53 Sup. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527].)

Because a new trial may ensue, we are disposed to give consideration to appellants' claim that the trial court erred in overruling their general and special demurrers to the indictment. Appellants' contention that count I of the indictment does not state facts sufficient to constitute a public offense and fails to conform to the requirements of sections 950, 951 and 952 of the Penal Code, cannot be upheld. The pleading under attack clearly charges that the acts of the

defendants allegedly constituting the conspiracy all occurred "in the County of Los Angeles and State of California and within the jurisdiction of this court". Also, the indictment clearly and understandingly described the principal elements of the crimes charged and was immune from the attacks made thereon by special demurrer. For a discussion of the accusatory procedure under our system of criminal justice, see *People* v. *Gilbert,* 26 Cal. App. (2d) 1, 6, 7, 8 [78 Pac. (2d) 770]. What we have just said applies with equal force to the attack made by demurrer on count II.

Appellants next assert that section 182 of the Penal Code, on which count I is based, is unconstitutional. This claim is grounded upon the contention that thereunder two different punishments are provided for the crime here charged, in that pursuant to said section a conspiracy to commit a crime denounced by the Penal Code is punishable in the same manner as would be the commission of the crime itself, which might vary from a minimum of one year to life, dependent upon the penalty provided for the substantive offense which forms the basis of the conspiracy; whereas conspiracy to commit a felony denounced by other statutes is punishable by imprisonment in the state prison for a maximum of two years. In the instant case it is argued that under the provisions of section 18 of the Corporate Securities Act a conspiracy to violate it would be punishable by imprisonment for a maximum term of five years. Appellants urge that said section 182 of the Penal Code contravenes section 11, article I, of our state Constitution. We are of the opinion that the Penal Code section does no violence to the rule that a law need not operate universally; that it is general in its scope if it applies to all of a certain class alike and operates uniformly upon all persons standing in the same category and upon rights and things in the same relation. (*In re West,* 75 Cal. App. 591, 597 [243 Pac. 55].) Appellants' apprehension of the difficulty which may arise in determining the period of imprisonment in the event of a conviction is answered in *People* v. *Welch,* 89 Cal. App. 18, 24 [264 Pac. 324], and *People* v. *Yant,* 26 Cal. App. (2d) 725, 731 [80 Pac. (2d) 506].

Appellants were not prejudiced because count I of the indictment charged and the jury found them guilty of the offense of "conspiracy to violate the Corporate Securities Act and grand theft", because but one penalty could be

imposed. While the pleading as to count I might be made more specific by adding the words "to commit" before the words "grand theft", the omission of the words does not warrant a reversal.

Taken as a whole, the instructions adequately and correctly advised the jury as to the law governing the issues framed by the indictment and raised by the evidence, except so far as the jury was misdirected concerning its right to receive certain evidence as to both defendants and to which errors we have heretofore given attention in this opinion.

For the reasons herein stated, the judgments and the orders denying defendants' motions for new trial are, and each of them is, reversed and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.