[Civ. No. 20431. First Dist., Div. One. June 18, 1962.]

THOMAS J. CALLAN, JR., Petitioner, v. THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent.

Aaronson, Cohn & Dickerson and Melvin E. Cohn for Petitioner.

Stanley Mosk, Attorney General, John S. McInerny and Edward P. O'Brien, Deputy Attorneys General, for Respondent.

SULLIVAN, J.—Defendant Thomas J. Callan, Jr., seeks a writ of prohibition restraining the Superior Court of San Mateo County from taking further action upon an indictment charging him with 52 felony crimes.

The indictment, returned by the grand jury on November 2, 1961, accuses petitioner and one Sergie Gregoriev of the following crimes, all of which are conspiracies in violation of section 182 of the Penal Code: 20 counts of conspiracy to commit grand theft; 8 counts of conspiracy to commit forgery; 8 counts of conspiracy to offer false or forged instruments to be filed of record; 8 counts of conspiracy to make a false certificate or writing by a notary public; and 8 counts of conspiracy to procure and execute fraudulent conveyances.[1] On November 27, 1961, petitioner moved to set aside the indictment on the grounds that petitioner had been indicted without reasonable or probable cause, that the 20 counts charging conspiracy to commit grand theft should be dismissed as a matter of law and that as a matter of law the 52 conspiracy counts should be consolidated. On November 30, 1961, the motion was granted as to the 8 counts charging conspiracy to procure and execute fraudulent conveyances and petitioner thereafter entered a plea of not guilty to each of the 44 remaining conspiracy counts. Petitioner then filed the present

---

[1]The indictment contained in all 68 counts. The remaining 16 counts with which we are not concerned charge Gregoriev alone with various substantive offenses.

petition for a writ of prohibition. (Pen. Code, § 999a.) We denied the petition as to all counts of the indictment except counts 1 through 20 inclusive, which charge conspiracy to commit grand theft, and as to said 20 counts ordered an alternative writ of prohibition to issue. Our discussion is therefore confined to the above 20 counts.

The gist of the alleged criminal enterprise is the acquisition of 20 parcels of land. Each of these is individually and separately covered by one of the 20 counts before us. All 20 parcels are alleged to have been conveyed to the defendant Gregoriev by 8 quitclaim deeds from grantors who are claimed to be fictitious and not the record owners of the property. The signatures of all 8 grantors[2] were acknowledged by the defendant Callan as notary public. Gregoriev, thereafter, by one grant deed, conveyed 18 of the 20 parcels to the United States Mortgage Corporation, a corporation, of which Callan and his brother are the only officers, directors and stockholders. United States Mortgage Corporation thereupon commenced an action to quiet title to such 18 parcels under the Destroyed Land Records Relief Law, sometimes referred to as a McEnerney action.

Each of the 20 counts in identical language charges "[t]hat the said SERGIE GREGORIEV and THOMAS J. CALLAN, JR., and each of them, on and between July 8, 1959, and February 1, 1961, at and in the County of San Mateo, State of California, did wilfully, unlawfully and feloniously conspire, combine and agree together to commit the crime of Grand Theft, a felony." All except 2 of the 20 counts allege four similar overt acts committed in pursuance of the object of the conspiracy. These may be summarized as follows: *Overt Act 1:* That on a specified date, not the same in all counts, Callan acknowledged the signature of the grantor of the quitclaim deed purporting to convey to Gregoriev the particular parcel of property covered by the count in question. *Overt Act 2:* That on a specified date, not the same in all counts, the defendant Gregoriev recorded said quitclaim deed. *Overt Act 3:* That on a specified date,[3] the defendant Gregoriev executed a grant deed purporting to convey to United States Mortgage Corporation the particular parcel covered by the count in question. *Overt*

---

[2] Two deeds were from the same grantor. Hence we have 8 separate deeds and 7 different grantors.

[3] In all of the 18 counts alleging four overt acts, except count 9, the date of the third overt act is February 1, 1961. In count 9, it is October 7, 1960. As we note above, counts 12 and 19 do not allege a third or fourth overt act.

*Act 4:* That on February 15, 1961, the defendant Callan, acting in the capacity of an officer of United States Mortgage Corporation, filed an action to quiet the title in the United States Mortgage Corporation as to the particular parcel. Two of the 20 counts (counts 12 and 19) allege only the first two overt acts and no others.

The testimony before the grand jury shows that during the period from July 1959 to January 1961 Gregoriev was named as grantee on 8 separate quitclaim deeds from 8 individual grantors, covering anywhere from 1 to 4 parcels of property, and altogether 20 parcels. Each of the deeds was shown to bear a notarial certificate of acknowledgment by the defendant Callan. The record also shows the execution of a grant deed by Sergie Gregoriev and Florence Gregoriev to United States Mortgage Corporation on February 1, 1961, and the commencement of the quiet title action by such corporation on February 15, 1961. The complaint to quiet title was verified by petitioner.

Willard Crown, a deputy assessor of San Mateo County, testified that at the request of the district attorney's office he had examined the official records of the San Mateo County Assessor's office to determine who were the assessed owners of the 20 parcels of land here involved on March 2, 1959. The witness gave the names of such assessed owners as disclosed by the records. He also testified that although he checked the records back to 1908 or 1909 individually for each of the 20 parcels, he did not find as assessed owners or in any way referred to in the records, any of the names of the grantors appearing on the quitclaim deeds to Gregoriev.

Jack Jones, an inspector employed by the district attorney's office, testified that after checking various common records and sources of information such as telephone and city directories for San Mateo County, San Francisco and other communities in the Bay Area, death records and voters' registration records in San Francisco and San Mateo County, credit bureaus, records of the Department of Motor Vehicles and Bureau of Criminal Identification and Investigation, as well as records of certain Y.M.C.A. hotels,[4] he was unable to locate any of the 8 grantors of the quitclaim deeds. He also testified that during a conversation he had with Callan on July 13, 1961, the latter admitted to him that he did not personally

---

[4]In a statement to the district attorney's office, Gregoriev said that the first grantor gave his address as the Y.M.C.A. on the Embarcadero in San Francisco.

know any of the grantors, and when asked if the grantors personally signed the deeds in his presence, Callan refrained from giving an answer and referred Jones to Callan's attorney.[5]

Richard Harris, a title insurance company escrow officer, testified that at the request of Gregoriev he paid delinquent taxes for, and thereby redeemed, several of the 20 parcels of property. While in the employ of another title company he had handled accommodation escrows for the redemption of 3 additional parcels of the 20 involved and had billed the defendant Callan for the amount of the delinquent taxes paid. Harris testified that Gregoriev was the person with whom he dealt and that he could not explain how Callan's name or the name of Callan Realty appeared on the escrow transaction.

Al Rocchi, a representative of another title insurance company, produced records of certain accommodation escrows pertaining to some of the 20 parcels of land, which disclosed that the defendant Callan had been billed for the taxes paid, that Callan had ordered preliminary title reports for two of the parcels and Gregoriev for 7 of the parcels. This witness also searched the titles of the 20 parcels but did not find that any of the persons named as grantors on the 8 quitclaim deeds ever appeared of record as having any interest in said property.

There was also read to the grand jury an unsigned, transcribed statement in question and answer form, given by the defendant Gregoriev to a deputy district attorney and an investigator.[6] Gregoriev stated that he received no money at all as a consideration for his conveyance of the 18 parcels to the United States Mortgage Corporation but that ''[w]hen the time came, we would decide what the breakdown would be. . . . We haven't worked out anything that's solid . . . nothing has been worked out, the percentage.'' In response to questions as to whether the property would be subsequently sold and what percentage he would get, Gregoriev stated that '' [w]hen you hold that many lots, you're certainly not buying them just to keep them. . . . I just did it that way—no particular reason, no financial adjustment, on a percentage basis

---

[5]The record shows that two different groups of members of the district attorney's staff interviewed Gregoriev at his residence on July 13, 1961, the first group arriving at about 7:15 p. m. and the second group, including Mr. Jones, about two hours later. We summarize *infra* the statements of Gregoriev at the earlier interview. We comment hereafter on the admissibility of all these extrajudicial statements.

[6]We comment *infra* on the admissibility of these statements.

if and when the property was sold.'' He stated that he had the title companies pay the taxes on the parcels involved, that he then reimbursed the title companies, using his own money, that he had not yet been reimbursed by United States Mortgage Corporation and did not ''know exactly how they will be worked out.'' According to Gregoriev, Callan had gone out with him to try to acquire some of the parcels and '' [y]ou could say that'' they were ''both sort of working together on this.'' Although at first stating that Callan put up no money to pay any of the delinquent taxes, he subsequently admitted that ''I really don't remember all of it. He might have put up some.''

According to Gregoriev, he received the quitclaim deeds in the following manner: He advertised for tax delinquent properties in San Francisco newspapers. The persons who eventually became the grantors on the quitclaim deeds contacted him by telephone or mail. All were in San Francisco. They would agree to accept amounts varying from $25 to $100 for their interest in the property. He would mail the quitclaim deed to them as directed, always to a hotel or in care of general delivery. He never personally met any of the 8 grantors. He paid them by sending cash by mail, was not furnished with any telephone numbers by them, and retained no correspondence bearing on the transactions. Gregoriev admitted in the above statement that he told Callan about the receipt of each deed and usually how much he had paid for it. He stated that the purpose of the conveyance of the several parcels of land to United States Mortgage Corporation was to clear the title, although he was unable to recall how the grant deed in question happened to be prepared by the attorney who did so. He stated that '' [t]o a degree'' he and Callan were working together to acquire the property and that it could be said that it was for them a joint venture.

Gregoriev, although appearing before the grand jury, claimed his constitutional privilege against self-incrimination. He did, however, testify that Michael Aaronson, an attorney at law, had represented him in connection with real estate matters and waived the attorney-client privilege existing between himself and Mr. Aaronson so that the latter could testify.

Mr. Aaronson, who is one of Callan's present counsel in the instant matter, thereupon testified that he prepared for Gregoriev the deed by which the latter conveyed the parcels of land to United States Mortgage Corporation. His law firm,

which had represented Callan in other matters, had been recommended by Callan to Gregoriev. Both Callan and Gregoriev had come in together to the witness' office. Mr. Aaronson, who understood the parcels involved to be owned by Gregoriev, suggested that "some dummy acquire title for my convenience in bringing this action." Callan suggested that he could use United States Mortgage Corporation and this corporation thereafter commenced the action with Mr. Aaronson as its attorney of record. However his "general impression was that at the conclusion of the suit title would be reconveyed back to Mr. Gregoriev." The witness also explained the "legal theory" behind his use of a so-called McEnerney action and the acceptance by local title companies of this method of establishing record title.

The defendant Callan appeared before the grand jury. He stated that he and his brother were the sole officers, directors and stockholders of United States Mortgage Corporation. He testified that the action to quiet title was commenced, as we have indicated above, only as an accommodation to Gregoriev, that he, Callan, paid nothing to Gregoriev for the latter's conveyance to United States Mortgage Corporation and that there were no financial arrangements of any nature between them. He loaned Gregoriev $200 for attorney's fees in connection with the quiet title action. He also admitted notarizing the quitclaim deeds, although the grantors named therein did not personally appear before him. He received preliminary title reports on some of the parcels before Gregoriev executed the grant deed to United States Mortgage Corporation. Callan's testimony also showed his activity in contacting persons who appeared to have some interest in 2 of the 20 parcels. In one instance he was apparently instrumental in obtaining a deed to Gregoriev from certain heirs of a deceased owner whose title had not been cleared. In another instance, he sought to have the person claiming an interest contact Mr. Aaronson.

Eight witnesses who had some interest in 10 of the parcels, some of whom were not owners of record, also testified before the grand jury. All of them stated that they had never heard of any of the persons designated as grantors in the quitclaim deeds to Gregoriev. Three of them stated that they had been contacted by Callan or his attorney relative to a possible sale of their interest. They refused the offers.

Petitioner's principal attack on the first 20 counts of the indictment is on the ground that, as a matter of law, the

evidence presented to the grand jury fails to establish the commission of the offense charged. He also urges that there is no evidence of a conspiracy between him and Gregoriev. Finally, petitioner asserts, that if the proof warrants any charge, it must be that of a single conspiracy rather than 20 separate conspiracies, there being but one course of conduct involved.[7]

As we have pointed out above, the first 20 counts charge a conspiracy "to commit the crime of Grand Theft." Respondent concedes that these counts charge violations of subdivision 1 of section 182 of the Penal Code, that is a conspiracy "[t]o commit any crime." None of these counts, however, contain allegations indicating the precise subject matter of the grand theft or the person or persons from whom the property was allegedly taken. Although the overt acts refer to activities and instruments pertaining to a specified parcel of real property, they furnish no basis for the conclusion that such real property is the subject matter of the grand theft and are silent as to the victims of the offense. The omission of such details is not fatal, since it is only required that the pleading be "in any words sufficient to give the accused notice of the offense of which he is accused." (Pen. Code, § 952.)
 Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence presented to the grand jury. (*People* v. *Roberts* (1953) 40 Cal.2d 483, 486 [254 P.2d 501]; *People* v. *Anderson* (1961) 55 Cal.2d 655, 657 [12 Cal.Rptr. 500, 361 P.2d 32].)
 Although the duty of determining whether or not an indictment should be returned is lodged exclusively in the grand jury and not in the courts (Pen. Code, § 939.8; *Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 55 [216 P.2d 859]), an "indictment . . . must be set aside by the court . . . [when] the defendant has been indicted without reasonable or probable cause." (Pen. Code, § 995.) " 'Reasonable or probable cause' means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused. 'Reasonable and probable cause' may exist although there may be some room for doubt." (*People* v. *Nagle* (1944) 25 Cal.2d 216, 222 [153 P.2d 344].) Such cause exists "if there is sufficient proof to make it reasonable to believe

___

[7] Our statement of this contention is derived from petitioner's broader argument that there could be, if any, only one rather than 44 separate conspiracies.

that the defendant is guilty of the offense charged." (*People* v. *Mitchell* (1946) 27 Cal.2d 678, 681 [166 P.2d 10].)

In *Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 183-184 [281 P.2d 250], it was stated that "[a]n indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." This means not any offense, but the offense charged. (*People* v. *Holtzendorff* (1960) 177 Cal.App.2d 788, 792 [2 Cal.Rptr. 676].) Therefore, the writ of prohibition will issue if no *competent* evidence was presented to the grand jury to support a reasonable belief that the *offense charged* was committed and that the defendant committed it. (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 8 [291 P.2d 929]; *Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8, 23 [345 P.2d 513]; *People* v. *Flanders* (1956) 140 Cal.App.2d 765, 768 [296 P.2d 13].) An indictment may not be set aside merely because some incompetent evidence was received by the grand jury, if there is otherwise sufficient competent evidence to support the indictment. (*McFarland* v. *Superior Court* (1948) 88 Cal.App.2d 153, 158 [198 P.2d 318]; *People* v. *Nathanson* (1955) 134 Cal.App.2d 43, 45 [284 P.2d 975]; *People* v. *Olf* (1961) 195 Cal.App.2d 97, 102 [15 Cal.Rptr. 390].) However, where there is absolutely no competent evidence before the grand jury of the commission by the accused of the crime charged (*Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 322 [121 P.2d 713]) or where there is a total absence of evidence supporting a necessary element of the crime charged, the indictment will be held invalid upon proceedings for a writ of prohibition. (*McFarland* v. *Superior Court, supra*; *Dong Haw* v. *Superior Court* (1947) 81 Cal. App.2d 153 [183 P.2d 724]; *People* v. *Olf, supra*; *People* v. *Bartlett* (1962) 199 Cal.App.2d 173, 179 [18 Cal.Rptr. 480].)

From the testimony presented to them, the grand jury could reasonably infer that an understanding or agreement had been entered into between Callan and Gregoriev with respect to certain tax delinquent properties in which the owner-taxpayers had presumably, or so it was hoped, lost interest.[8] These properties could be redeemed by anyone and thus reclaimed from the state by the payment of the delinquent taxes, penalties and other amounts as prescribed by law. (Rev.

---

[8]Although the indictment charges separate conspiracies as to each parcel of land, in the interest of convenience, we shall refer to a single agreement or conspiracy.

& Tax. Code, § 4101 et seq.) It was reasonable to infer that the defendants agreed to place on the public records certain quitclaim deeds running in favor of Gregoriev and that the deeds were forged. None of the grantors appeared or could be found. Testimony showed that they had never been connected with the record title and were not the assessed owners of record. Callan admitted that although he had notarized the deeds, he had never seen the grantors personally or for that matter ever heard of them. The grand jury were justified in believing that the grantors were fictitious and nonexistent and that the quitclaim deeds were forged. (Pen. Code, § 470.) They could also reasonably infer that Callan and Gregoriev agreed that, as part of the plan, Callan would, as a notary public, acknowledge the deeds, Gregoriev would place them of record, and that, as a step in clearing title to 18 of the 20 parcels, Gregoriev would convey them to a corporation owned and controlled by Callan. The grand jurors had a right to disbelieve Callan's explanation that this was done purely as an accommodation. (*Lorenson* v. *Superior Court, supra,* 35 Cal.2d 49, 57.) The complaint to quiet title was verified by Callan, the same person who notarized the deeds. He also filed an affidavit, required by the applicable statute, stating that the corporation plaintiff had purchased the properties from Gregoriev and that he knew of no adverse claims to the property.

The above action was no ordinary quiet title action but one brought under the so-called McEnerney Act[9] (Code Civ. Proc., §§ 751.01-751.28) against "All Persons Claiming any Interest in, or Lien Upon, the Real Property" involved (Code Civ. Proc., § 751.05). Without detailing its provisions or procedure, it is sufficient to state that such an action is one *in rem* (*Soher* v. *Cabaniss* (1911) 161 Cal. 548, 549 [119 P. 911]) and that a judgment thereunder is "conclusive upon every person who at the commencement of the action had or claimed any estate, right, title, or interest in or to all or any part of such property and upon every person claiming under him by title subsequent to the commencement of the action." (Code Civ. Proc., § 751.15.)

Other evidence raises inferences of an agreement or understanding between the two defendants: The fact that Callan had ordered preliminary title reports for 2 of the parcels; the redemption of 3 parcels through accommodation escrows

[9]For convenience, we will use this generally accepted term in lieu of the longer "Destroyed Land Records Relief Law."

at a title company which billed Callan for the delinquent taxes and other costs of redemption; the payment by Callan to Gregoriev of $200 to be used for attorney's fees in the quiet title action, the grand jury being entitled to reject Callan's explanation that it was a loan; Callan's activity in contacting persons who claimed an interest in 2 of the parcels; and finally, the fact that it was through Callan that Gregoriev went to Callan's attorney who in turn was counsel of record in the quiet title action brought by Callan's corporation.

The testimony therefore supports a reasonable belief that the defendants entered into an agreement having for its object the acquisition of the parcels of land involved. ▮▮▮ As stated in *Lorenson* v. *Superior Court, supra,* 35 Cal.2d 49, 57-58: "Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. '[i]t was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are in- volved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole. (*People* v. *Jones,* 136 Cal.App. 722 [29 P.2d 902]; *People* v. *Benenato,* 77 Cal.App.2d 350 [175 P.2d 296].)' (*People* v. *Burton,* 91 Cal.App.2d 695, 708 [205 P.2d 1065].)"

However there is no competent evidence in the record as to what the defendants intended to do with the property after the quiet title action had been brought to a conclusion. The statements made by Gregoriev, in the absence of Callan, to various members of the district attorney's staff were hearsay as to Callan and therefore incompetent evidence. ▮▮▮ Statements made by one defendant outside the presence of his co-defendant, not in furtherance of the alleged conspiracy and, after consummation or frustration of the conspiracy are hearsay as to the latter. (*People* v. *Gilliland* (1940) 39 Cal.App. 2d 250, 262 [103 P.2d 179]; *People* v. *Roberts, supra,* 40 Cal. 2d 483, 489.) ▮▮▮ Statements of a conspirator which are not made in furtherance of the conspiracy are not admissible against his coconspirator. (See 4 Wigmore, Evidence (3d ed.) § 1079; Witkin, California Evidence, p. 264.) Gregoriev's statements were not in furtherance of the conspiracy; they were undoubtedly made after the conspiracy had been frus-

trated by the investigation. His statements implying that the properties would probably be sold and stating in effect that the defendants had not yet agreed how the proceeds would be divided but would decide that later, constitute incompetent evidence and cannot be relied upon as a rational basis for the indictment.

At this point we take up the competing arguments of the parties. Callan contends that the evidence furnishes no rational ground for assuming the commission of the offense charged. It is his position that the above scheme which we have outlined cannot constitute a conspiracy to commit grand theft since one "cannot steal property by a forged instrument." In support of this proposition he cites *People* v. *Nye* (1929) 96 Cal.App. 186 [273 P. 837] and *People* v. *Dadmun* (1913) 23 Cal.App. 290, 294 [137 P. 1071]. Petitioner obviously refers to that portion of the opinion in *People* v. *Nye* dealing with a count in an information charging grand theft of certain deeds. The court held that since the deeds were obtained by fraud and there was neither delivery nor passage of title, they were worthless and could not be made the basis of a charge of grand theft. *People* v. *Dadmun*, involving an indictment charging grand larceny of a deed, held that the deed being undelivered was not a written instrument within the meaning of section 492 of the Penal Code and could not be a subject of larceny. Such cases offer no solution to the problem before us.

Respondent seeks to uphold the indictment on two bases: (1) That it does not accuse Callan of conspiracy to commit grand theft of real property but simply to commit grand theft. The forged deeds, when placed of record, so runs this argument, constituted a "public false pretense" and operated as a continuing inducement to persons interested in the property, ultimately being the means of obtaining money from the eventual purchasers. (At oral argument respondent presented for the first time the claim that the forged deeds also constituted a false pretense to the court from which, as part of their plan, the alleged conspirators would obtain a judgment under the McEnerney Act. Respondent has not cited, nor have we been able to find, any authority in support of this last point. We need not give it further attention.) (2) That the indictment and the transcript of the grand jury testimony, when examined together, indicate that the subject matter of the theft alleged in each count is the particular parcel of real property described in the overt acts alleged

therein. In essence, this argument claims that although the McEnerney judgment contemplated by the conspirators would be obtained in reliance upon forged deeds, nevertheless under the applicable statute (Code Civ. Proc., § 751.15) it would be conclusive even against the true owners of the land upon the authority of *Bradford* v. *Trapp* (1920) 49 Cal.App. 493 [193 P. 584]. In this way, respondent contends, the owners would be deprived of their property and the defendants would have conspired to commit grand theft of property.

In *Bradford* v. *Trapp, supra,* 49 Cal.App. 493, upon which respondent relies, the defendants Trapp purchased real property and received a deed to it, which was forged but which they believed to be valid. After the defendants entered into possession, they commenced an action and obtained a judgment under the so-called McEnerney Act, pursuant to proceedings in all respects regular and in conformity with the statute. In an action in equity brought against them by the true owner of the property to vacate the McEnerney judgment, it was held that such judgment was final and conclusive even against the true owner, although the defendants' title established in the McEnerney action was based upon a forged deed. The court stated: "The forged deed in evidence was the equivalent of perjured testimony, and it is the settled law of this state that a judgment cannot be set aside because it is predicated upon perjured testimony. There must be an end to litigation. [Citations.]

"Since the McEnerney suit brought in as defendants all persons claiming any estate in the property in dispute, respondent was in law a party thereto just as though he had been expressly named therein. The court had jurisdiction of the subject matter and of the parties, and the decree operated upon all persons claiming or having any claim to any estate, right, or title in the property in question." (49 Cal. App. at p. 496.)

It is to be noted that the defendant purchasers in the *Bradford* case were the parties who commenced the McEnerney action and that they were not parties to the forgery. Thus the case is distinguishable from the alleged conspiracy now before us, where, under the grand jury evidence, the sellers were parties to the forgery and commenced the McEnerney action. Nevertheless, the *Bradford* case is offered in support of the proposition that the McEnerney judgment which the alleged conspirators contemplated obtaining would be a judgment in rem and would enable these defendants to pass good title to a bona fide third party purchaser. In such

a way, respondent urges, the true owners of the property would be deprived of it and a theft would be committed. We will consider respondent's argument within the above limitations. It is to be noted that respondent does not urge that the *conspirators* would obtain good title by the McEnerney judgment as against the true owners of the property.

In summary, then, respondent urges that two rational grounds can be found for the conspiracy before us: First, it was a conspiracy to steal *money* (or other thing of value) from the eventual *future* purchasers of the property. Secondly, it was a conspiracy to steal the *real property* itself from the present owners.

Theft is defined by section 484 of the Penal Code in the following language: "Every person who shall feloniously steal, take, carry, lead, or drive away the *personal property* of another, or who shall fraudulently appropriate property which has been entrusted to him, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or *real or personal property* . . . is guilty of theft. . . ." (Emphasis added.) ▮▮▮ Although the crimes of larceny, embezzlement, obtaining money by false pretenses and kindred offenses have been consolidated by the provisions of section 484 into the single crime of theft, the elements of the several offenses have not been changed thereby. (*People* v. *Jones* (1950) 36 Cal.2d 373, 376-377 [224 P.2d 353]; *People* v. *Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271]; *People* v. *Myers* (1929) 206 Cal. 480, 483 [275 P. 219].) ▮▮▮ As is stated in *People* v. *Ashley, supra*: "The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses. (*People* v. *Nor Woods,* 37 Cal.2d 584, 586 [233 P.2d 897].)" (42 Cal.2d at p. 258.)

There is no rational basis for assuming that the defendants conspired to commit theft by larceny. ▮▮▮ The elements of larceny are that: (1) the property stolen be the *personal* property of another; (2) the taker took the property from the owner's possession without his consent; (3) the taker asported the property; and (4) he did so with an intent, without claim of right, to deprive the owner of his property wholly and permanently. (*People* v. *Williams* (1946) 73 Cal.App.2d 154, 157 [166 P.2d 63]; *People* v. *Cannon* (1947)

77 Cal.App.2d 678, 692 [176 P.2d 409].) The distinction between larceny and obtaining money or property by false pretenses turns on a question of title. ▮ "If the possession has been obtained by fraud, trick, or device, and the owner of it intends to part with his title when he gives up possession, the offense, if any, is obtaining money by false pretenses. But, where the possession has been obtained through a trick or device, with the intent, at the time the party receives it, to convert the same to his own use, and the owner of the property parts merely with the possession and not with the title, the offense is larceny." (*People* v. *Tomlinson* (1894) 102 Cal. 19 [36 P. 506] at p. 23.)

Respondent's first theory, namely a theft of money from ultimate purchasers of the property is not based on any competent evidence. As we have pointed out, aside from Gregoriev's extrajudicial statements there is no evidence that the defendants had an understanding between them to sell the parcels of land. If there were such a proper inference, it would necessarily include the inference that third-party purchasers would part with their purchase money finally and completely—with the title to it as well as its possession. Such theft, contemplated by the defendants, could not be that of larceny. (*People* v. *Tomlinson, supra,* 102 Cal. 19.) Indeed, respondent nowhere urges a conspiracy to commit theft by larceny. ▮ Under respondent's second theory, namely a theft of the real property itself, there, of course, could be no basis in law since *real* property cannot be the subject of larceny, the statute (Pen. Code, § 484) applying only to *personal* property.

▮ It is also clear that there is no basis in the grand jury evidence for believing that the defendants conspired to commit theft by embezzlement. To support such an offense, the money or property which is the subject of such offense must have been "entrusted" to the defendants. (Pen. Code, §§ 484, 503.) No such evidence appears.

Finally, we proceed to determine whether, as indeed the respondent appears to urge, it is reasonable to believe that petitioner and Gregoriev entered into a corrupt agreement to commit grand theft by obtaining money or property by false pretenses. ▮ At the outset it is clear that real property as well as personal property may be the subject of theft by false pretenses. (Pen. Code, §§ 484, 532; *People* v. *Rabe* (1927) 202 Cal. 409, 416 [261 P. 303]; *People* v. *Pugh* (1955) 137 Cal.App.2d 226, 236 [289 P.2d 826].)

▮ The elements of theft by false pretenses are the

following: (1) That the defendant made a false pretense or representation; (2) that he did so with intent to defraud the owner of his property; and (3) that the owner was in fact defrauded in that he parted with his property—both possession and title—in reliance upon the false representations. (*Perry* v. *Superior Court* (1962) 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529] ; *People* v. *Ashley, supra,* 42 Cal.2d 246, 259; *People* v. *Jones, supra,* 36 Cal.2d 373, 377.)

 As is stated in *People* v. *Ashley, supra*: ''The false pretense or representation must have materially influenced the owner to part with his property, but the false pretense need not be the sole inducing cause.'' (P. 259.)

 We first apply the foregoing principles to respondent's contention that the conspiracy to commit grand theft had for its object the obtaining of money from purchasers of the property and was in essence a conspiracy to steal money from the future purchasers. No such sales were ever consummated since the conspiracy, if this was its object, never reached such stage of fruition. We must then necessarily examine what the parties contemplated doing in this respect. As we have pointed out, there is no competent evidence from which it can be inferred that the defendants intended to sell the properties to third parties. There is absolutely no evidence identifying third-party purchasers, or specifying the dates or terms of sale. Under the evidence in the record, there were no victims to whom, it might be argued, the defendants conspired to make a false representation or pretense.

Nor do we find a rational basis for a conclusion as to the making of the false representation itself. The grand jury could not reasonably infer from the evidence that the defendants contemplated making an express and direct false claim of ownership to any specific purchaser since the purchasers had not been identified. Respondent, therefore, appears compelled to resort to the theory that the 8 forged quitclaim deeds were a ''public false pretense'' on the record. Assuming such deeds to constitute a false claim of title, we do not see how it can be inferred that this false pretense or representation would be made to third-party purchasers, so as to furnish this element of the crime. While it is true that a false representation can be made to the general public, as for example through advertising (*People* v. *Pugh, supra,* 137 Cal.App.2d 226, 234; see 35 C.J.S., False Pretenses, § 29, p. 851), in such instances, it is usually found that the false representation is brought to the attention and therefore

"made" to the victim. No such inference can be raised here.

Finally, there was no evidence justifying the grand jury in believing that the conspiracy charged was, under respondent's first theory, one to commit grand theft rather than petty theft. (Pen. Code, §§ 486, 487.) No testimony was presented indicating that the consideration contemplated to be paid was in excess of the sum of $200. The record shows that Paul L. McKay, a qualified appraiser and the principal appraiser for the County of San Mateo, testified as to the market value of each of the 20 parcels of land at the time of the grand jury hearing. All of such appraisals were in excess of $200, ranging from $400 to as high as $2,000 for the 20 parcels. A conclusion from this testimony as to what the sales price would necessarily be at some indefinite time in the future would be purely speculative.

Taking up respondent's second contention in support of the indictment, it is obvious that no rational ground can be found for concluding that the defendants conspired to commit a theft of the *real* property by false pretenses. There is no evidence at all that they intended as the object and purpose of the alleged agreement to make any representations of any kind to the actual owners of the property so as to induce the latter to part with their property. Quite the contrary, the plan seems to have been to circumvent and avoid the real owners entirely. Nor, in our view, is it a reasonable inference from the evidence before the grand jury, that the defendants, by commencing the McEnerney action intended to represent themselves as owners so as to induce the true owners to part with the property. As we view the evidence, the purpose of the McEnerney action seems to have been to clear the title without provoking any inquiry by the true owners.

We hold therefore that there is no competent evidence supporting a reasonable belief that the defendants conspired to commit grant theft. Although it is unnecessary to so state, it is clear that our holding does not preclude the determination of a rational ground for assuming that the defendants under the evidence presented, have committed other offenses, including offenses in violation of section 182 of the Penal Code. In view of our above conclusion, it is unnecessary for us to consider the other arguments advanced by petitioner for the setting aside of the indictment as to the first 20 counts.

Let a peremptory writ of prohibition issue as to counts 1 to 20 inclusive of the indictment.

Bray, P. J., and Tobriner, J., concurred.