[Crim. No. 29280. Second Dist., Div. Four. Aug. 11, 1977.]

THE PEOPLE, Plaintiff and Appellant, v.
SOL G. GARDNER et al., Defendants and Respondents.

**COUNSEL**

John K. Van de Kamp, District Attorney, Harry B. Sondheim and Roderick W. Leonard, Deputy District Attorneys, for Plaintiff and Appellant.

Wilbur F. Littlefield, Public Defender, Harold E. Shabo, Mitchell J. Grossman and G. Keith Wisot, Deputy Public Defenders, Simon & Sheridan, Thomas R. Sheridan and D. Steven Cameron for Defendants and Respondents.

## OPINION

**KINGSLEY, J.**—In a multi-count indictment, defendants were charged in nine counts with "bucketing" in violation of section 29100 of the Corporations Code, and eight counts of grand theft, in violation of subdivision 1 of section 487 of the Penal Code. On defendants' motions under section 995 of the Penal Code, the trial court denied the motions as to the grand theft counts, but granted it as to the bucketing counts. The People have appealed;[1] we reverse.

I

Of the 17 counts in the indictment, 14 counts (counts II and III, IV and V, VI and VII, VIII and IX, X and XI, XII and XIII, XIV and XV) are bracketed counts, the even numbered counts charging grand theft against 7 victims, and the odd numbered counts charging bucketing on the same dates (or periods) as are alleged in the accompanying theft counts. Count XVI charges grand theft against an eighth victim, but count XVII alleges bucketing only in general terms for the same period as is alleged in count XV in connection with the theft alleged in count XIV. Count I is an overall count, charging bucketing during the entire period of time alleged in the other bucketing counts.

■ The People contend that the trial court granted the motion to dismiss count XVII on the theory that it merely duplicated count XV. While it is true that the two counts allege the same dates, examination of the grand jury transcripts shows that there were two transactions on those dates, each involving a different buyer; under those circumstances, the People are entitled to show, if they can, that there were two independent offenses committed. Count XVII should not have been dismissed on the ground given by the trial court.

■ Count I is obviously one that duplicates, by the period alleged, all of the eight separate bucketing counts. While nothing in the grand jury

[1]Pursuant to Penal Code section 1238, subdivision (a)(1).

transcript shows any consummated transactions other than those alleged in the eight specific counts, the evidence does show that the defendants were, during the entire period alleged in count I, engaged in a continuous business involving the kind of acts herein involved. Although the People cannot, in the end, support a judgment on all eight specific transactions and also on count I, they are entitled to go to trial on the blanket charge as well as the specific charges.

## II

Although defendant Gardner contended in the trial court (although not in his briefs on appeal) that prosecution for bucketing had been preempted by federal law, that contention is without merit. The transactions herein involved all preceded February 23, 1973; the federal law applying to such transactions did not become effective until April 21, 1975. There was no preemption.

## III

■ We turn to the basic issue involved in this appeal: Did the evidence before the grand jury show, within the limits required in passing on a motion under section 995, that defendants had engaged in bucketing as defined in subdivision (c) of section 29008 of the Corporations Code as in effect during the period of time herein involved? We conclude that it did.

Subdivision (b) of section 29008 defines bucketing as follows: "(b) Making or offering to make any contract respecting the purchase or sale of any securities or commodities, wherein both parties intend, or the keeper intends, that the contract shall be, or may be, deemed terminated, closed, or settled when the public market quotations of prices for the securities or commodities named in the contract reach a certain figure without a bona fide purchase or sale of the securities or commodities."

According to the evidence before the grand jury, defendants (operating as King Commodity Company) sold to the alleged victims what are known as "double options" to purchase future contracts for the purchase and sale of sugar and silver.[2] The system operates as follows: A

---

[2]An option to buy only a contract for future delivery or only an option to sell such a contract is known as a "single option." As we explain later, dealing in single options has markedly different characteristics than dealing in the "double options" herein involved, which are options under which the optionees may, at any time within the option period, elect either to buy, or to sell, a future delivery contract.

purchaser buys from a dealer (the "keeper" of the statutory definition), for a price (known as a "premium") an option, good for a fixed period, to buy or to sell a contract for the future delivery of the commodity, at a price determined by the market price of such commodity on the day the option is purchased. If the price of such a future delivery contract, during the option period, does not increase or diminish to any significant degree, the purchaser simply lets the option lapse, thus losing his premium. If the price of the future delivery contract does increase, or diminish, in a significant degree, the purchaser exercises his option and secures, at the predetermined price, a future delivery contract worth an amount significantly different from the fixed price, to afford him a profit. Having exercised the option, and secured a future delivery contract, he may either elect to enforce the new future delivery contract, resell that contract at his then profit, or (in the event of an adverse market change before time set for delivery) let the contract lapse, being subject to damages for breach of that future delivery contract. Nothing in law requires a person who has contracted to buy, or to sell, a commodity specifically to perform his bargain; such a contracting party may always elect to be subject to a suit for, and recovery of judgment for, the damages incurred by the other party. And, at the time of breach, the parties to such a contract may, if they so elect, agree to settle the damage claim for such amount as they may agree upon.[3]

■ Since the statute involved applies, by its terms, only to contracts "respecting the purchase or sale of any securities or commodities," defendants contend that the options sold by them, calling for the possible ultimate delivery of future delivery contracts and not for the delivery of the commodities themselves, are not within the statutory prohibition. That contention is specious. The statutory language is not limited to contracts *for* the purchase or sale, but, in wider terms, applies to any contract "respecting" such an ultimate transaction. Options to acquire contracts of purchase or sale are contracts "respecting" purchase or sale.

■ The real issue is whether the evidence before the grand jury shows either that both parties to the option transactions, or at least the sellers ("keepers") of such options, did not actually and bona fidely intend the delivery of the future delivery contracts called for in the options.

---

[3] Since the future delivery contracts do not involve commodities of the kind that makes the contracts specifically enforceable, the damages usually will be the difference in the market price between the price in the contract and the price the injured party will pay in the market to buy the commodity promised but not delivered.

■ We agree with defendants that the intent of the parties to the options herein involved as to ultimate delivery to, or by, the optionees of the commodity involved is immaterial. The options were not options to sell or buy the commodity (although such ultimate transaction might result) but only to acquire a contract that, as above explained, might or might not lead to actual physical delivery of the commodity. It follows that the testimony of the buyers of the options, relied on by the People, that they never intended any actual delivery of the sugar or silver involved, is immaterial. We can see in the record before us no evidence that the buyers of the options did not intend (unless the option had become valueless by reasons of an extreme market fluctuation or almost total stagnation) to receive the future delivery contracts called for in the options purchased.

■ We come, then, to the ultimate issue: Does the evidence before the grand jury contain evidence from which a trier of fact reasonably could conclude that, whatever the intent of the buyers of the double options may have been, defendants never intended to honor the options if exercised. In approaching that issue, we are mindful of the fact that the seller of such an option need not have, at the time of sale, the ability to comply with the option if immediately exercised.[4] It is sufficient if he intends to acquire the promised contracts when as and if the optionee exercises the option at the future time contemplated by both parties.

Defendants point to carefully drafted language in the option contract, to the effect that all options (unless hedges)[5] contemplate the actual delivery and receipt of the "property" involved. But that self-serving language, although bearing on the issue of intent, is not controlling. There is before the grand jury evidence from which a trier of fact might conclude that, in spite of the formal protestation of the written instruments, defendants never intended to honor any of the options:

[4]A person who intended the immediate acquisition of the contract involved would not buy an option, he would buy the contract itself without having to pay a "premium" for a right he could exercise directly and without any intervening option.

[5]A person who has executed a future delivery contract to buy, or one to sell, may "hedge" his contract by purchasing another contract to the opposite effect. Then, when the date of delivery arrives, he can call on the seller of the alternative contract to produce (or to receive) the commodity involved. In such a situation, the persons giving a future delivery contract will stand in the same economic position as if he had delivered (or received) the commodity on the date the future delivery contract was executed, receiving only the profit involved in a cash contract for immediate sale.

It is agreed by the People, and by defendants that, although a person who sells a single option (i.e., involving only an option to buy or an option to sell) may "hedge" his obligation, there is no way in which a seller of the double options herein involved could hedge.

(a) At no time did defendants ever own, or have arrangements to acquire, *any* future delivery contracts;

(b) Since defendants could not hedge against their obligations as optionors, they could honor the options only if they had, during the option period, assets sufficient to enable them to buy the promised contracts when the optionees demanded delivery. But defendants never had assets even vaguely approaching the requirement. In fact, and underlying the theft counts in the indictment, the evidence shows that defendants did not, as they promised they would, even keep available the fund created in their hands by the receipt of the premiums for the options. That is a course of dealing from which a trier of fact could well conclude that defendants never intended to honor the options they had given.[6]

Since there was evidence sufficient to support the indictment, the trial court erred in dismissing the "bucketing" counts. The order is reversed.

Files, P. J., and Dunn, J., concurred.

A petition for a rehearing was denied September 6, 1977.

---

[6]Only in the event that the market price of future delivery contracts did not move in any significant amount, could defendants have escaped liability to the optionees. Had they retained the premium fund, as promised, defendants might possibly have convinced a jury that they honestly expected that any change in market price would be within the limits of the premium fund, so that they could honor the options, losing only the premiums paid. But defendants did not retain the premium fund and had no other available assets.