[Crim. No. 29666. Second Dist., Div. Four. Mar. 8, 1978.]

THE PEOPLE, Plaintiff and Appellant, v.
THAD SMITH SHIRLEY et al., Defendants and Respondents.

COUNSEL

John K. Van de Kamp, District Attorney, Donald J. Kaplan and Eugene D. Tavris, Deputy District Attorneys, for Plaintiff and Appellant.

Wilbur F. Littlefield, Public Defender, Harold E. Shabo, Bernard J. Rosen and Dennis A. Fischer, Deputy Public Defenders, Harry E. Weiss and Susan L. Wolk, for Defendants and Respondents.

## OPINION

JEFFERSON (Bernard), J.—By an amended grand jury indictment, Thad Smith Shirley and Joyce A. Richards (hereinafter respondents) were charged in count I with grand theft in violation of Penal Code section 487, subdivision 1. In count II, respondents were charged with forgery in violation of Penal Code section 470.

Respondents demurred to the amended indictments; the demurrers were overruled. Pursuant to Penal Code section 995, respondents then moved to set aside both counts of the indictment. The trial court granted their motions as to count I. The People have appealed from this order setting aside count I of the amended indictment.

I

A preliminary contention raised by respondents on this appeal is that the People are precluded from appealing from a trial court's order that sets aside only one count of a two-count indictment. The contention of

respondents is that the People have a right of appeal only when the entire indictment has been set aside. Respondents point to the language of Penal Code section 1238, subdivision (a)(1), which provides that the People may appeal from "[a]n order setting aside *the* indictment, information, or complaint." (Italics added.) Arguing that present law favors narrow and strict construction of the People's right to appeal, which is conferred upon them by the Legislature, respondents would distinguish between an appeal taken from an order setting aside an entire indictment and one taken from an order that sets aside one count of a multi-count indictment.

We recognize that " '[t]he Legislature has determined that except under certain limited circumstances the People shall have no right of appeal in criminal cases.' [Citation.] Those circumstances are enumerated in section 1238." (*People* v. *Drake* (1977) 19 Cal.3d 749, 754 [139 Cal.Rptr. 720, 566 P.2d 622].) The question presented before us is that of the appropriate interpretation of the scope of Penal Code section 1238, subdivision (a)(1).

The People call to our attention that recent decisions of the Courts of Appeal have assumed the People's right to appeal partial dispositions of multi-count indictments but without discussion of the issue since no attack was made on the People's right to appeal in this situation. In *People* v. *Parker* (1974) 44 Cal.App.3d 222 [118 Cal.Rptr. 523], on the People's appeal, the court reversed the trial court's order setting aside certain counts of an information. The reversal was made on the merits. Similarly, in *People* v. *Gardner* (1977) 72 Cal.App.3d 641 [140 Cal.Rptr. 238], on an appeal by the People from a dismissal of several counts of an indictment, the court assumed jurisdiction of the appeal and reversed the trial court's order on the merits—that the evidence before the grand jury was sufficient to support the dismissed counts.

In *Drake,* the People appealed from a trial court's order, on defendant's motion for a new trial, that denied defendant's motion for a new trial on a first degree robbery conviction but reduced the conviction to grand theft as a lesser offense necessarily included within the crime of robbery. The court dismissed the People's appeal, holding that there was no statutory authorization in Penal Code section 1238 for an appeal by the People from such an order. In rejecting the People's contention that the trial court's order in *Drake* could properly be considered as coming within Penal Code section 1238, subdivision (a)(1), as an order "setting aside the indictment, information, or complaint," the court reasoned that

the trial court's order modifying its finding of guilt manifestly was *not* an order setting aside an information.

In *People* v. *Orin* (1975) 13 Cal.3d 937 [120 Cal.Rptr. 65, 533 P.2d 193], the People appealed from an order dismissing two counts of a three-count information. Over the prosecutor's objection, the trial court had permitted defendant to plead guilty to count III charging an assault with a deadly weapon (Pen. Code, § 245, subd. (a)) and thereupon dismissed in furtherance of justice, pursuant to Penal Code section 1385, count I, charging attempted robbery (Pen. Code, §§ 211, 664) and count II, charging burglary (Pen. Code, § 459). All three counts arose out of the same incident. The *Orin* court reversed the trial court's order dismissing counts I and II as invalid for failure of the trial court to set forth the reasons of the dismissal as required by section 1385 and because the record did not support a dismissal in furtherance of justice.

The appeal by the People in *Orin* was predicated on Penal Code section 1238, subdivision (a)(8), which provides for an appeal by the People from "[a]n order or judgment dismissing or otherwise terminating the action before the defendant has been placed in jeopardy or where the defendant has waived jeopardy." In *Drake,* the California Supreme Court commented upon the jurisdictional question of the right of the People to appeal pursuant to Penal Code, section 1238, subdivision (a)(8), by stating: "In *People* v. *Orin* (1975) 13 Cal.3d 937, 940 [120 Cal.Rptr. 65, 533 P.2d 193], we *implied* that an order dismissing two counts of a three-count indictment might fall under subsection (8)." (*Drake, supra,* 19 Cal.3d 749, 757, fn. 9.) (Italics added.)

The significance of the *Drake* court's reference to *Orin* is that Penal Code, section 1238, subdivision (a)(8), uses language comparable to that used in subdivision (a)(1). Subdivision (a)(8) speaks in terms of an appeal from an order or judgment dismissing *"the* action," while subdivision (a)(1) speaks in terms of an appeal from an order setting aside *"the* indictment." If an order dismissing one count of a multi-count indictment may be considered an order dismissing *"the* action" for purposes of affording the People a right of appeal under subdivision (a)(8), an order dismissing one count of an indictment of a multi-count indictment should be considered an order setting aside *"the* indictment" for purposes of affording the People a right of appeal under subdivision (a)(1) of Penal Code section 1238.

Furthermore, it is to be noted that in *People* v. *Burke* (1956) 47 Cal.2d 45 [301 P.2d 241], the Supreme Court made the same implication with respect to the appropriate interpretation of Penal Code section 1238, subdivision (a)(8). In *Burke,* on an appeal by defendant from a judgment of conviction, the People sought to claim error by the trial court in striking from the information at the time of sentence an allegation of a prior conviction. In the trial court the People made no objection to the trial court's action. In rejecting the People's contention, the *Burke* court pointed out that in the trial court the People did not object to the striking of the prior felony conviction allegation and, further, that "the People failed to appeal, although the order striking the charge of prior conviction was in its nature one of the orders specified as appealable . . . by paragraph 1 . . . of section 1238 of the Penal Code. That statute provides that the People may appeal '1. From an order setting aside the indictment, information, or complaint; . . .' The trial court's action was in substance 'an order setting aside [a part of] the . . . information'; . . ." (*Burke, supra,* 47 Cal.2d 45, 53.)

A similar statute, Penal Code section 1466, which provides for appeals by the People to the superior court from an order or judgment of an inferior court, has been interpreted as including the right to appeal from a partial disposition. Section 1466, subdivision 1(a), which is identical to Penal Code section 1238, subdivision (a)(8), provides for an appeal by the People "[f]rom an order or judgment dismissing or otherwise terminating the action before the defendant has been placed in jeopardy or where the defendant has waived jeopardy." In *People* v. *Agnello* (1968) 259 Cal.App.2d 785 [66 Cal.Rptr. 571], the trial judge of a municipal court dismissed, at defendant's request, one count of a two-count complaint. The People appealed from the order of dismissal. In holding that the People had a right to appeal from a dismissal of one count only, pursuant to Penal Code section 1466, subdivision 1(a), the *Agnello* court stated: " 'The People have appealed from this order of dismissal made prior to trial and at defendant's request. It is properly here. [Citations.] Appeal from a final order dismissing only one count of a criminal complaint is proper even though there may be another count pending trial. [Citation.]' " (*Agnello, supra,* 259 Cal.App.2d 785, 789.)

▮ We conclude that Penal Code section 1238, subdivision (a)(1), authorizes an appeal by the People from an order setting aside one or more counts of an indictment that contains other counts not set aside. The appeal herein is therefore properly before us.

## II

We next consider whether the trial court was correct when it concluded that insufficient evidence had been presented to the grand jury to establish "reasonable or probable cause." Penal Code section 995 provides that an indictment must be set aside if the evidence is deficient in this regard.

■ We note first the standard of review which is applicable to the trial court's determination. "Probable cause for an indictment is shown if a person of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused; an indictment will not be set aside if there is some rational ground for assuming the probability that an offense has been committed and the accused is guilty of it; if there is some evidence to support the indictment, the courts will not inquire into its sufficiency [citation]." (*Somers* v. *Superior Court* (1973) 32 Cal.App.3d 961, 963 [108 Cal.Rptr. 630].)

■ The principle has been established that "[e]very legitimate inference that may be drawn from the evidence must be drawn in favor of the information [or indictment]" (*People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664]), and that "[n]either the trial court in a section 995 proceeding, nor an appellate court on review thereof, may substitute its judgment as to the weight of the evidence for that of the committing magistrate [citation]." (*Birt* v. *Superior Court* (1973) 34 Cal.App.3d 934, 938 [110 Cal.Rptr. 321].) It is thus settled that, as an appellate court, we have "limited powers" in reviewing the action of the grand jury in the case before us.

Penal Code section 939.6, which governs the receipt of evidence before the grand jury in its investigation of a charge, provides, in subdivision (b), that "[t]he grand jury shall receive none but evidence that would be admissible over objection at the trial of a criminal action, but the fact that evidence which would have been excluded at trial was received by the grand jury does not render the indictment void where sufficient competent evidence to support the indictment was received by the grand jury." (See, also, *Callan* v. *Superior Court* (1962) 204 Cal.App.2d 652, 662 [22 Cal.Rptr. 508].)

On the other hand, "[i]t has been held, therefore, that 'where there is absolutely no competent evidence before the grand jury of the commis-

sion by the accused of *the crime charged* [citation] or where there is a total absence of evidence supporting *a necessary element* of the crime charged, the indictment will be held invalid . . . .' " (*Roads* v. *Superior Court* (1969) 275 Cal.App.2d 593, 597 [80 Cal.Rptr. 169].) (Italics in original.) (See also, *Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 322 [121 P.2d 713], and *Callan, supra.*) "[I]t is the duty of all three tribunals [the committing entity and the courts which review its action] to discard—as unreasonable—inferences which derive their substance from guesswork, speculation, or conjecture . . . ." (*Birt, supra,* 34 Cal.App.3d 934, 938.)

With these principles in mind, we summarize the evidence presented to the grand jury in the case at bench.

In January of 1972 Joseph G. and Lena Delores Bledig, husband and wife, resided in Van Nuys. The couple owned a 20-acre parcel of undeveloped real property in Palmdale. Joseph Bledig testified that late that month, he and Mrs. Bledig drove to Palmdale to see how land development was progressing in the area where their property was located.

Bledig stopped at the Intercontinental Realty Company and spoke to respondent Joyce A. Richards, a licensed real estate broker, and respondent Thad Smith Shirley, a formerly licensed real estate broker who was employed by Richards. Bledig asked what his land in Palmdale was now worth. Richards stated that it was worth about $7,000 an acre, while Shirley was of the opinion that it was worth more—$9,000 an acre. Richards inquired of Bledig whether he wished to sell the property; Bledig stated that he did not, but that he would leave his residential address with her in the event the value of the land increased.

The next day, Richards appeared at the Bledig home in Van Nuys with an offer from a Harold McNaughten to purchase the Bledig property for $140,000. The Bledigs refused to sell at that price. A few days later they received a letter from Richards, suggesting that they make a counteroffer. The Bledigs wrote to Richards on February 3, 1972, telling her they were going to keep the land in anticipation that a proposed airport would increase its value.

However, in May or June 1972, the Bledigs decided to sell. They visited Palmdale and placed a "[f]or sale by owner" sign on the property. After receiving only one telephone inquiry about the property in a

week's time, the Bledigs again went to Palmdale and discovered their sign was missing. Bledig replaced the sign; when there was no response, the couple drove to Palmdale and found that the second sign was gone also.

Bledig testified that on this latter occasion he visited Intercontinental Realty and spoke to broker Richards, who had just arrived at the office with an unidentified female companion. Bledig suggested to Richards that she might have removed the signs from his property because he had not listed it with her; she denied this. The female companion stated to Bledig, in the presence of Richards, that the land under discussion had been sold; Bledig denied that he had sold his land. Richards said nothing. Bledig asked Richards to check on the new sign he planned to put on his property, and she agreed to do so.

The next day Bledig received a letter from Richards, purporting to explain why she had not answered him when he denied that his land had been sold in their conversation the previous day.

In November 1972, Bledig did not receive his property tax statement for the Palmdale property. He investigated this circumstance on December 7, 1972, and discovered that the county records indicated that his property had been sold.

Bledig further testified that he had never agreed to a sale and had never received any proceeds of a sale. He denied that he and his wife had executed, as grantors, on May 30, 1972, a grant deed naming Daniel and Margaret Reid as grantees. He denied signing escrow instructions which had been given to Realty Title Escrow Corporation on the same date; he denied signing a statement of information received by Realty Title Escrow Corporation. These above-mentioned documents were introduced as exhibits before the grand jury.

Bledig also denied that he had ever lived at apartment 205, 6400 Franklin, Hollywood, the address given to the escrow officer as his; he denied signing a rental application for that address; he denied that he had opened a bank account at the Valley Bank of Nevada in Las Vegas, or that he had directed the deposit of escrow proceeds of $71,452.41 into that bank account. He further disclaimed any knowledge concerning the check written on that account on July 26, 1972, in the amount of $65,000, showing him as the maker and showing the Continental Coin Company as the payee. Bledig also denied having any dealings with the Contin en-

tal Coin Company, or signing three letters, purportedly signed by him, directing Continental to deliver Swiss gold francs to a Mr. Abrams. He declared, too, that he had not signed various correspondence purportedly between him and Intercontinental Realty and broker Richards.

The grand jury also heard testimony from E. V. Klinker, the escrow officer of Realty Title Escrow Corporation, who handled the transaction purportedly transferring the Bledig property to the Reids. Klinker had met respondent Thad Shirley prior to an occasion late in May 1972, when Shirley appeared at Klinker's office in Los Angeles and advised him to expect an escrow shortly.

Thereafter, on May 30, 1972, respondent Richards came to Klinker's office and directed him to prepare escrow instructions for the sale of the Bledig property. He was given the Hollywood address for the Bledigs and a New Jersey address for the Reids. On the same day, Klinker sent the required documents, including escrow instructions, to the Reids at the New Jersey address. Upon their return—by mail—on June 9, 1972, Klinker sent the deed, the escrow instructions and the statement of information to Bledig at the Hollywood address for the Bledigs' signatures.

These documents were returned to Klinker, by mail, on June 21, 1972, all purportedly signed by the Bledigs, including the notarized grant deed. Klinker noted that the escrow instructions had been modified to provide that the check representing the proceeds of the sale was to be sent to Valley Bank of Nevada. The escrow officer had received a preliminary title report from Security Title Insurance Company, to whom he sent the deed and information statement on June 21, 1972.

Klinker, as instructed, sent a check for $71,452.42 to the account in Las Vegas, and a check for $6,000 to Intercontinental Realty in Palmdale as broker fees. Klinker testified that, although the transaction had been conducted by mail, persons purporting to be Mr. and Mrs. Reid, the buyers, had visited him at his office before the close of the transaction. He stated that reference had been made to the missing "for sale by owner" signs on the Bledig property—that the purported Mr. Reid had said he hoped there would be no trouble about them.

William Payne of Safeco Title Insurance, the successor to Security Title Insurance Company, also testified before the grand jury. He stated that the records of Security indicated that Security had sustained a

$78,000 loss on the title insurance policy obtained by Klinker in favor of the Reids. He noted that a check, payable to the Reids, had been drawn for that amount on February 16, 1973. Payne further declared that after Klinker had forwarded the documents evidencing the transaction to Security, neither of the respondents would have had access to them.

Robert H. Wynne, senior vice president of the Valley Bank of Nevada, identified the signature cards purportedly signed by Bledig when opening the bank account in his bank, and the checks drawn on the account. The party presenting the $65,000 check requested that the funds be transferred to Union Bank in North Hollywood.

Joe Sonner, manager of Continental Coin Company, testified that he received a telephone call at the company office from a person purporting to be Mr. Joseph Bledig, who stated that he wished to invest $65,000 "from some land deals" in gold coins. A check was left in Sonner's mail box, in the amount of $65,000. Sonner was later visited by a Mr. Abrams, who carried letters authorizing the delivery to him of three shipments of gold coins, on July 29, August 13, and September 2, 1972. Sonner never saw Bledig personally, but delivered 3,750 Swiss gold francs, valued at $19 each, to Abrams.

Lawrence Moute, an investigator for the district attorney's office, was called before the grand jury as an expert in the field of questioned documents and handwriting identification. He stated that the notary signature on the grant deed was a forgery. He could not clearly establish, however, that the Bledigs' signatures on the grant deed were forgeries. Moute also revealed that the letters of authorization for delivery of the gold coins had been signed by the same person, but that they had not been signed by Bledig.

Fingerprint expert Eugene Mulholland, of the Federal Bureau of Investigation, testified that he had compared an exemplar of respondent Shirley's fingerprints with three latent prints found on the following documents: the statement of information used during escrow; a letter from Richards to Bledig, and his purported reply on the same sheet of paper; and an envelope marked May 23, 1972, addressed to Intercontinental Realty in Palmdale from "J.G.B."; it showed the Franklin address in Hollywood as the return address. Mulholland found the fingerprints on these documents identical with respondent Shirley's prints. (Klinker had testified earlier that, to his knowledge, Shirley had no opportunity to examine the statement of information lodged in escrow.)

Other evidence established that the manager of the Hollywood apartment house where Bledig had supposedly lived never saw the tenant; that the previous address in San Diego which had been given on the rental application did not exist; that Richards, when confronted by an investigator for the district attorney's office, acknowledged that she had known about the sale when she spoke to Bledig in June 1972, about the removal of the signs from his property, but said nothing to him because sometimes coowners of property will sell property without the knowledge of the other owners. Richards was also interviewed by another investigator, Sletmoen, to whom she explained that she had not mentioned the sale in progress to Bledig on that occasion because she was confused as to which parcel of property he was referring. Richards admitted that she had known that Bledig lived in Van Nuys, but she had not been surprised to hear from him at a Hollywood address because her clients moved around often.

In the case at bench, the count which was set aside charged grand theft. Various forms of that crime are defined in Penal Code section 484; subdivision (a), provides, in pertinent part, that "[e]very person who shall feloniously steal . . . the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, . . . is guilty of theft."

Included within section 484 is not only the offense of taking of personal property (larceny), but also " 'embezzlement, theft by trick and device, and theft by false pretenses.' " (*People* v. *Eitzen* (1974) 43 Cal.App.3d 253, 261 [117 Cal.Rptr. 772]; see also, *People* v. *Ashley* (1954) 42 Cal.2d 246 [267 P.2d 271].) ██ ██ There is authority which holds that larceny necessarily involves the taking of personal property (*Callan, supra,* 204 Cal.App.2d 652, 667) but "it is clear that real property as well as personal property may be the subject of theft by false pretenses. [Citations.] [¶] The elements of theft by false pretenses are the following: (1) That the defendant made a false pretense or representation; (2) that he did so with intent to defraud the owner of his property; and (3) that the owner was in fact defrauded in that he parted with his property— both possession and title—in reliance upon the false representations." (*Callan, supra,* 204 Cal.App.2d 652, 668-669.) "Proof of a false representation may be established by either words or conduct, or by both." (*People* v. *Fujita* (1974) 43 Cal.App.3d 454, 467 [117 Cal.Rptr. 757].)

In this case before us, it seems evident that the theory of the prosecution in making the presentation to the grand jury was that a theft by false pretenses had taken place; that the respondents had schemed to sell real property—in which they had no ownership interest—to the purchasers in order to obtain money. It was undoubtedly immaterial to the respondents as to the identity of the ultimate victims of their chicanery—the Bledigs, the purchasers, or the title insurance company.

The trial court, however, during the hearing on respondents' section 995 motion, indicated that it was concerned because of the absence of any testimony by the purchasers, the Reids. While Klinker testified that individuals identifying themselves as the Reids came to his office during the period when the transaction was in progress, this testimony was clearly hearsay if offered to prove the truth of the out-of-court statements of these declarants, namely, that they were the Reids.

This alleged "gap" in the evidence presented to the grand jury was compounded, argue respondents, by the lack of any evidence about receipt of funds into escrow from the buyers of the land; that while Klinker testified that he paid certain sums *out* of escrow as instructed, he did not testify about how the funds were received into escrow. But Klinker testified that he sent escrow instructions to the purchasers—the Reids—in Hackensack, New Jersey, and that the instructions were returned, duly signed. The inference is clear that, since Klinker testified he paid the escrow funds in two checks according to the alleged sellers' instructions, the purchase price in the escrow came from the Hackensack, New Jersey purchasers.

Respondents successfully persuaded the trial court that the evidence was fatally deficient, in that it did not directly establish the identity of the victims of the theft, or that any victims sustained at least a temporary loss. Upon appeal, the People contend that the grand jury was entitled to make certain reasonable inferences from the evidence presented to them.

As has been indicated earlier in our discussion, our review is limited, and we cannot substitute our judgment for the weighing process of the grand jury. We are not concerned with the "beyond a reasonable doubt" burden-of-proof standard, nor was the grand jury. We can only determine whether there were legitimate inferences which could be drawn by the grand jury from the admissible evidence presented which would permit of a strong suspicion that a crime had probably been committed and that it had been committed by respondents.

We know of no authority that *precludes* the charge of theft in an indictment because the victim is not specifically identified. Ordinarily, of course, the victim supplies the basic information about the crime; what was taken, how it was taken, and its value. However, it is possible to conclude that a theft has taken place without such evidence.

In our view, certain legitimate inferences could be made by the committing authority here—the grand jury. One was that a false representation had been made to the purchasers of the Palmdale property, i.e., that good title to that property would be conveyed to them. Nor do we have any difficulty with concluding that the grand jury could reasonably infer from the circumstances of the transaction that it was conducted by the perpetrators for the sole object of obtaining money to which they were not entitled, with fraudulent intent. Furthermore, we hold that the grand jury was entitled to infer that the purchasers of the Palmdale property did in fact deposit the requisite funds into the escrow, did not receive title to the real property, and were thus deprived of their personal property.

Respondents point out that the testimony of Payne about the loss of $78,000 suffered by the title company in paying this amount to Daniel and Margaret Reid through a check dated "2-16-73" was hearsay and inadmissible pursuant to Penal Code, section 939.6, subdivision (b). ■ Obviously, Payne, as senior advisory title officer with Safeco Title Insurance, the successor to Security Title Insurance Company, was testifying from records of Safeco Title, and had no personal knowledge of the transaction. His testimony was that of relating what the hearsay entries by Security Title employees set forth in Security Title's records. Payne's testimony was insufficient to qualify Security Title's records as admissible under the business-records exception to the hearsay rule established by Evidence Code section 1271. Payne's testimony did not meet the requirement of Evidence Code section 1271, subdivision (c), which provides that the custodian or other qualified witness must testify to the identity and mode of preparation of the business record. Such testimony is essential in order for the court to be able to make a finding (that can be implied from a ruling on admissibility), as required by the Evidence Code section 1271, subdivision (d), that the sources of information for the business-record entries and the method and time of preparation of such entries were such as to indicate trustworthiness of the entries.

 Since respondents rely upon the contention that the grand jury could not consider Payne's testimony in making a determination that it was the title company and not the New Jersey Reids who ultimately suffered a loss, a contention which we uphold, nevertheless, the record before the grand jury establishes the Reids as the victims of the grand theft. The dismissal of count I, therefore, was error.

The order appealed from is reversed.

Files, P. J., and Bigelow, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.