[No. B232299. Second Dist., Div. Six. Dec. 12, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
EDUARDO JOSE GUZMAN, Defendant and Appellant.

## COUNSEL

Hooper, Lundy & Bookman and Patric Hooper for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Mary Sanchez and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—A physician, like any other person, knows that he cannot lawfully obtain money based upon a fraudulent representation. This is theft by false pretenses. (*People v. Shirley* (1978) 78 Cal.App.3d 424, 436 [144 Cal.Rptr. 282].) A physician should also know that he cannot lawfully submit a Medi-Cal claim representing that he is supplying an expensive FDA-approved intrauterine device when, in fact, he is supplying a cheaper non-FDA-approved intrauterine device.[1]

Eduardo Jose Guzman, a licensed obstetrician-gynecologist, appeals from the judgment entered after his conviction by a jury of Medi-Cal fraud in violation of Welfare and Institutions Code section 14107, subdivision (b)(1). The jury returned a guilty verdict on a single count alleging that he had submitted a fraudulent Medi-Cal claim for the insertion of an intrauterine device (IUD) into patient Blanca G. The court suspended the imposition of sentence and placed appellant on formal probation for 36 months. As a condition of probation, appellant was ordered to perform 90 days of community service.

---

[1] FDA is an acronym for the United States Food and Drug Administration.

Appellant contends (1) the trial court erroneously upheld the validity of a search and seizure that he had challenged through a Penal Code section 995 motion,[2] (2) the trial court erroneously admitted evidence "concerning the purported illegality of [appellant's insertion of] non-FDA approved IUDs in his patients," (3) the evidence is insufficient to show that appellant intended to defraud Medi-Cal, and (4) the Medi-Cal claim for Blanca G. "is not false or fraudulent as a matter of law." We affirm.

*Facts*

Prosecution Evidence

The Medi-Cal program supplies a "provider manual" (manual) to physicians who provide services under the program. The manual informs physicians how to submit claims and specifies a unique procedure code for each allowed service.

Since November 2001 the manual has specified a procedure code of X1522 for the insertion of a ParaGard IUD. In the wake of the "Dalkon shield debacle," the FDA has focused on the safety of the IUD. The ParaGard, engineered and built to rigorous specifications, is the only "Copper T" type IUD approved by the FDA. Medi-Cal will pay only for FDA-approved IUD's. A physician cannot lawfully insert a non-FDA-approved IUD into a patient. ParaGard IUD's are manufactured in New York by Teva Pharmaceuticals. Until April 2006 Medi-Cal paid $261.80 for each insertion of a ParaGard IUD. In April 2006 the payment increased to $374.16 per IUD. At the time of trial in August 2010, a single ParaGard IUD cost $392.

From 2004 through February 2006, appellant's office billed Medi-Cal for the insertion of 176 IUD's under procedure code X1522. For these IUD's, Medi-Cal paid appellant $45,919.72. During this period, appellant did not use the ParaGard IUD. Instead, he used a cheaper Copper T type IUD manufactured in Mexico by Dentilab.

The actual Medi-Cal billing was done by appellant's employees (billers). Appellant did not mention the name "ParaGard" to the billers, nor did he tell them to use procedure code X1522. The billers knew to use code X1522 for the insertion of an IUD because the code was "in the computer."

On February 16, 2006, Medi-Cal fraud investigators went to appellant's office and asked him to provide copies of invoices for ParaGard IUD's billed to Medi-Cal in 2005. He was expressly told that he could be reimbursed only

---

[2] All further statutory references are to the Penal Code unless otherwise stated.

for this specific IUD. Appellant "said he couldn't find the invoices right now but would send them in." On February 23, 2006, the investigators received in the mail three invoices from appellant. The invoices were from Alpine Oxygen Home Care (Alpine Oxygen) and were dated in 2005. The invoices showed that Alpine Oxygen had sold 45 Copper T IUD's to appellant at $378 each. The invoices did not specify the brand of the IUD's.

The invoices were forgeries. Alpine Oxygen never sold IUD's. The owner of Alpine Oxygen never had any contact with appellant, and he did not recognize the handwriting on the invoices.

On February 21, 2006, after appellant had received actual notice of the requirement of "ParaGard IUD only reimbursement," someone in appellant's office signed a Medi-Cal claim form showing that, seven days earlier, an IUD had been inserted into patient Blanca G. The claim form billed Medi-Cal under procedure code X1522, the code for a ParaGard IUD. Appellant concedes that "[t]he copper T [IUD] used . . . for this patient [Blanca G.] had been manufactured in Mexico and was not a ParaGard brand of copper T."

### Defense Evidence

Ruben Arlidyd Sanchez worked for appellant for more than six years and did his billing from 2004 until December 2005, when her employment ended. On appellant's behalf, Sanchez bought IUD's for about $100 each from a vendor named Pablo. When Sanchez billed Medi-Cal for an IUD, appellant did not tell her what procedure code to put on the claim form. For each IUD, Sanchez used procedure code X1522 and billed Medi-Cal $300. She believed that procedure code X1522 applied to any IUD, not just the ParaGard brand.

Appellant testified as follows: The Dentilab IUD's were "very safe and . . . effective." Appellant purchased them because they cost less than ParaGard IUD's. Each Dentilab IUD cost about $150, while each Paragard IUD cost between $200 and $300.

Until early 2006, appellant did not know that the FDA regulated Copper T IUD's. It was not until February 16, 2006, when the investigators came to his office, that he learned that Medi-Cal would pay only for ParaGard IUD's. At that time, he directed his staff to dispose of the Dentilab IUD's.

Appellant's staff found the Alpine Oxygen IUD invoices that he sent to the investigators. He believed that they were genuine invoices.

When appellant inserted an IUD into a patient, he would write on a form the type of IUD (e.g., Copper T) that he had inserted. He would then give the

form to a biller in his office, who would complete the claim form to be sent to Medi-Cal. Appellant did not "understand the billing" process. He never intended to deceive Medi-Cal.

### Jury Verdict

The jury was unable to reach unanimous verdicts on 20 counts alleging that appellant had submitted fraudulent Medi-Cal claims for the insertion of Dentilab IUD's into patients other than Blanca G. According to appellant's counsel, the only difference between these 20 counts and the Blanca G. count is that the claim for services provided to Blanca G. was signed after Medi-Cal investigators informed appellant that Medi-Cal would pay only for the insertion of ParaGard IUD's. The claims for the Dentilab IUD's inserted into the other patients were signed before the investigators so informed appellant. The People note, "It appears that the timing of [the Blanca G.] false claim, postdating the Medi-Cal investigators' visit, may have been a factor distinguishing it from other false claims charged." The trial court dismissed the counts on which the jury had deadlocked.[3]

### Search and Seizure

The allegedly unlawful search and seizure occurred about 11:00 a.m. on February 16, 2006, when Medi-Cal investigators made an unannounced visit to the waiting room of appellant's office and requested copies of ParaGard IUD invoices for 2005. The office was open for business and patients were in the waiting room. The investigators gave appellant until February 23, 2006, to provide the invoices. A few days later, appellant mailed the forged Alpine Oxygen IUD invoices to the investigators.

At the preliminary hearing, appellant made a section 1538.5 motion to suppress the invoices as the fruit of an unlawful search and seizure. Appellant's counsel conceded that the investigators' entry into the waiting room did not violate the Fourth Amendment "because . . . the waiting room area . . . is open to the public." Counsel was correct. (See *People v. Pham* (1987) 189 Cal.App.3d 1531, 1533 [235 Cal.Rptr. 99].) Counsel argued that the Fourth Amendment violation occurred when, without advance notice, the investigators requested the invoices: "I think any of us can go into a doctor[']s waiting room cause it's almost like a public area. But when you go in unannounced and then you say give me documents, that exceeds the 4th amendment."

---

[3] Appellant seeks to use the dismissed counts as a lever showing that at no time did he have the intent to defraud Medi-Cal. But each count rises or falls on its own, and even inconsistent verdicts may not be impeached. (*People v. Santamaria* (1994) 8 Cal.4th 903, 911 [35 Cal.Rptr.2d 624, 884 P.2d 81].) Here, there is no inconsistency based on the timing of the Medi-Cal claims.

Defense counsel pointed out that, pursuant to Welfare and Institutions Code section 14124.2, subdivision (b)(1), unannounced visits are allowed only in "exceptional situations." The statute provides: "Applicants, providers, or others receiving or seeking reimbursement under the Medi-Cal program or other health care programs administered by the department or its agents or contractors shall furnish information or copies of records and documentation upon request by the department. Unannounced visits to request this information shall be reserved for those exceptional situations where arrangement of an appointment beforehand is clearly not possible or is clearly inappropriate to the nature of the intended visit." (*Ibid.*) Counsel argued that the People had failed to present any evidence of an "exceptional situation" warranting the unannounced visit to appellant's office.

The magistrate denied the section 1538.5 motion. The magistrate reasoned that, because a "break" had occurred "between the request [for the invoices] and the submission of the documents," there was no "seizure here within the meaning of the 4th amendment or a search for that matter."

In the trial court, appellant renewed his challenge to the validity of the search and seizure through a section 995 motion to set aside the information. The trial court denied the motion. The rules attendant to trial court review of a magistrate's denial of a suppression motion are well known (see *People v. Magee* (2011) 194 Cal.App.4th 178, 182 [123 Cal.Rptr.3d 689]) and need not be repeated.

"On review by appeal or writ [of the trial court's denial of a section 995 motion], . . . the appellate court in effect disregards the ruling of the [trial] court and directly reviews the determination of the magistrate holding the defendant to answer. [Citations.]" (*People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].) "We view the record in the light most favorable to the [magistrate's] ruling, deferring to those express or implied findings of fact supported by substantial evidence. [Citations.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 973 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) "We judge the legality of the search by 'measur[ing] the facts, as found by the trier, against the constitutional standard of reasonableness.' [Citation.] Thus, in determining whether the search or seizure was reasonable on the facts found by the magistrate, we exercise our independent judgment." (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529 [40 Cal.Rptr.3d 422].) We will uphold the magistrate's ruling if it "is correct on any theory of the law applicable to the case, even if the ruling was made for an incorrect reason. [Citation.]" (*Ibid.*)

■ Even were we to assume that the unannounced visit to appellant's office was unlawful, the invoices would not be subject to suppression as the

fruit of an unreasonable search and seizure. The remedy of suppression is permissible only when compelled by the Fourth Amendment. (*In re Lance W.* (1985) 37 Cal.3d 873, 888–889 [210 Cal.Rptr. 631, 694 P.2d 744].) ■ There is no authority supporting the proposition that an otherwise lawful request for records at a doctor's office violates the Fourth Amendment merely because of noncompliance with a statutory notice requirement. Even if such an authority existed, we agree with the magistrate's analysis. Suppression of evidence is not required because the investigators did not demand the immediate production of the records. Instead, they gave appellant seven days to produce the invoices. By so deferring the production of the documents, the investigators substantially complied with the notice requirement. They did not disrupt the operation of appellant's medical practice.

■ In addition, here the submitted invoices were not the fruit of any poisonous tree planted by the government. Appellant personally, or his agents, planted their own tree and harvested forged invoices. The Medi-Cal investigators certainly did not anticipate that demonstrably false invoices would be submitted as a result of the request for records. Tender of these documents was an independent crime, and appellant is fortunate that he was not charged with forgery. (§ 470, subd (d).) In *In re Richard G.* (2009) 173 Cal.App.4th 1252, 1262 [93 Cal.Rptr.3d 506], this court concluded that "[a]n individual's decision to commit a new and distinct crime, even if made during or immediately after an unlawful [search or seizure], is an intervening act sufficient to purge the 'taint' " of the illegal police conduct. "[T]he defendant's new criminal behavior breaks the causal link between any constitutional violation and evidence of the new crime." (*Ibid.*)

### Admission of Evidence

Appellant contends that the trial court erroneously admitted evidence "concerning the purported illegality of [appellant's insertion of] non-FDA approved IUDs in his patients." Appellant filed a motion in limine to exclude this evidence. But before the trial began, appellant withdrew the motion and there is no trial court ruling to review. Having elected not to press for a ruling, the issue is waived. (*People v. Stevens* (2007) 41 Cal.4th 182, 198–199 [59 Cal.Rptr.3d 196, 158 P.3d 763]; see also *People v. Obie* (1974) 41 Cal.App.3d 744, 750 [116 Cal.Rptr. 283].)

### Sufficiency of the Evidence

■ The offense of which appellant was convicted, i.e., presenting for payment any false or fraudulent claim for services or merchandise, requires an intent to defraud. (Welf. & Inst. Code, § 14107, subd. (b)(1).) "An intent to defraud is an intent to deceive another person for the purpose of gaining a

material advantage over that person or to induce that person to part with property or alter that person's position by some false statement or false representation of fact, wrongful concealment or suppression of the truth or by any artifice or act designed to deceive. [Citation.]" (*People v. Pugh* (2002) 104 Cal.App.4th 66, 72 [127 Cal.Rptr.2d 770].)

Appellant contends that the evidence is insufficient to show that he intended to defraud the Medi-Cal program. Appellant claims: "[He] did not fill out [the Medi-Cal claim] forms and did not instruct his employees to use [procedure code X1522]. Rather, the code had been programmed into the office computer at some point and was thus automatically generated when the billers entered IUD insertions. [¶] While [appellant] obviously bears some responsibility for erroneous codes contained in his office computers, the fact that the bills continued to be submitted using the X1522 code for the non-ParaGard IUDs does not begin to rise to a level of fraudulent intent. At worst, this is the precise type[] of mistake or negligence that occurs in busy physician offices . . . ." This is a good argument at the trial level. But here, it ignores the factual finding by the jury.

On a claim of insufficiency of the evidence, we view the record " ' "in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" ' [Citation.] '. . . [W]e presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 806 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) All conflicts in the evidence are resolved in favor of the judgment. (*People v. Neely* (2009) 176 Cal.App.4th 787, 793 [97 Cal.Rptr.3d 913].) "[I]t is not within our province to reweigh the evidence or redetermine issues of credibility. [Citation.]" (*People v. Martinez* (2003) 113 Cal.App.4th 400, 412 [7 Cal.Rptr.3d 49].) "[W]e are a court of review, not of first view . . . ." (*Cutter v. Wilkinson* (2005) 544 U.S. 709, 718, fn. 7 [161 L.Ed.2d 1020, 125 S.Ct. 2113]; see also *Cazavos v. Smith* (2011) 565 U.S. 1 [181 L.Ed.2d 311].)

 A reasonable trier of fact could find beyond a reasonable doubt that, when appellant's office submitted the claim form for Blanca G., appellant intended to defraud Medi-Cal. Appellant testified that on February 16, 2006, when the investigators came to his office, he learned that Medi-Cal would pay only for ParaGard IUD's. The claim form for Blanca G. was signed five days later. Thus, when the claim form was submitted, by his own testimony appellant knew that he was not entitled to receive payment from Medi-Cal for the Dentilab IUD he had inserted into Blanca G.

Moreover, when the investigators asked appellant to provide ParaGard IUD invoices, he provided forged invoices. Even if appellant did not participate in the forgery, he should have known that the invoices were false. The invoices showed that in 2005 appellant had purchased 45 Copper T IUD's for $378 each. But appellant testified that in 2005 he was using Dentilab Copper T IUD's that he had purchased for about $150 each. Ruben Arlidyd Sanchez testified that, on appellant's behalf, she had purchased IUD's for about $100 each from a vendor named Pablo.

■ Appellant's submission of forged invoices gives rise to a reasonable inference of consciousness of guilt, and the jury reasonably drew this inference. Appellant's conduct undermines the claim that he was merely negligent. "The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142 [14 Cal.Rptr.3d 212, 91 P.3d 164].)

### Argument That Blanca G. Claim Is Not False or Fraudulent as a Matter of Law

Appellant argues that the Medi-Cal claim for the IUD inserted into patient Blanca G. "is not false or fraudulent as a matter of law." Appellant explains: "[T]he only reason the People can argue that the claim is for the ParaGard brand of IUD is that the code 'X1522' was inserted in the claim as the procedure code for the IUD inserted in this patient . . . ." "[T]he only Medi-Cal provision even addressing procedure code X1522 is in a Medi-Cal manual . . . which specifies that billing code X1522 is for a 'ParaGard IUD.' " "[U]nless the provisions of the Medi-Cal manual explaining the meaning of procedure code X1522 . . . are enforceable, the procedure code is meaningless. . . . [T]hose provisions are not enforceable because they were not promulgated pursuant to the rulemaking requirements of the State Administrative Procedure Act ('APA')."

In denying appellant's motion for a new trial, the court rejected the identical argument: "After careful thought and analysis, it . . . struck me that the whole issue of APA approval of the regulation of the billing code . . . is a red herring. The elements of the offense were proven regardless of whether or not the APA procedures should have been invoked; . . . there was still a fraudulent representation as to what was being billed for with the intent to defraud."

We agree with the trial court. Irrespective of whether the manual's procedure code provisions were adopted pursuant to Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.) rulemaking requirements, the

Blanca G. Medi-Cal claim was fraudulent because appellant used code X1522 knowing that it designated only a ParaGard IUD, not a less costly Dentilab IUD for which Medi-Cal would not pay. Phrased otherwise, appellant submitted a bill for disbursement of public funds that he knew was false. He paid either $100 or $150 for the Dentilab IUD and sought reimbursement for a more costly ParaGard IUD. This is Medi-Cal fraud. It requires no sophisticated legal analysis to so conclude. This is just common sense. Had appellant truthfully told Medi-Cal the brand of IUD he had inserted into Blanca G., he would have received no reimbursement, not even the $100 or $150 he had paid for the Dentilab IUD.

The judgment (order granting probation) is affirmed.

Gilbert, P. J., and Perren, J., concurred.